# IN THE SUPREME COURT OF TEXAS

══════════
No. 11-0713
══════════

IN THE INTEREST OF E.N.C., J.A.C., S.A.L., N.A.G. AND C.G.L.,
MINOR CHILDREN

════════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE SIXTH DISTRICT OF TEXAS
════════════════════════════════════════════════

**Argued September 12, 2012**

JUSTICE GREEN delivered the opinion of the Court.

A court cannot terminate a person's parental rights unless the State proves by clear and convincing evidence that the parent engaged in certain proscribed conduct, as specified in the Family Code, and that termination is in the best interest of the children. In this case, an immigrant convicted in another state of unlawful conduct with a minor and given a probated sentence years before his children were born was later deported to Mexico. The State relied on these facts in petitioning to terminate this father's parental rights, yet put on no evidence concerning the offense committed years earlier, nor the circumstances of his deportation. We are asked to determine whether legally sufficient evidence supports termination of this father's parental rights under these facts. We conclude the evidence is legally insufficient and, accordingly, reverse the court of appeals' judgment in part and remand the case to the trial court.

## I. Facts and Procedural Background

Francisco, a citizen and resident of Mexico, was born in May 1975. Years before his children were born, Francisco was convicted in Wisconsin of an offense involving an underage girl and placed on probation. In 1996, Francisco moved from Wisconsin to Texas without completing the terms of his probation. Once in Texas, Francisco met Edna and married her. The couple lived together for eight or nine years. The marriage resulted in two children: J.A.C., born in mid-1998, and S.A.L., born in late-1999. Francisco supported the family, including a child born to Edna from a previous relationship.

In 2004 or 2005, after Francisco and Edna separated, Francisco approached the immigration authorities in Dallas for purposes of procuring a green card. Because Francisco had left Wisconsin in violation of his probation terms, he was arrested, jailed, and ultimately deported. Francisco is not allowed to return to the United States for ten years (until at least 2014), but he testified that he would like to return to the United States to help J.A.C. and S.A.L.[1]

In the meantime, J.A.C. and S.A.L., along with their three half-siblings, remained with Edna in Texas.[2] The Department of Family and Protective Services investigated Edna several times over the years, beginning in 2000, but the Department always chose to allow the children to remain with

---

[1] The record does not indicate the reason for the ten-year ban on reentry.

[2] Francisco is not the father of Edna's other three children. As such, only J.A.C. and S.A.L.—Francisco's children—are at issue in this proceeding.

their mother.[3]  There were never any allegations concerning Francisco during this period, nor were there any negative findings concerning Edna, until this case.

Since his deportation, Francisco has resided in his hometown of San Miguel de Allende, Guanajuato, Mexico, where his mother also lives.  Francisco has remarried,[4] has two young children, and works at a hotel where he makes the equivalent of $400 a month.  Before the Department removed J.A.C. and S.A.L., Francisco would call them about three times a week or on weekends, and sometimes daily.  Francisco's father, Alvaro, who remained in Texas, also took the children to visit Francisco and Francisco's mother in Mexico—J.A.C. twice and S.A.L. at least once.  The children last visited their father one-and-a-half years before trial.  Alvaro testified that, at the end of that visit, the children did not want to come home and that they wanted to stay with their father in Mexico.

Francisco also provided financial support to his children before they were removed to foster care.  When Francisco and Edna separated, Edna apparently did not seek child support from Francisco.  Instead, Francisco and Edna entered into an informal agreement where Alvaro would visit the children and bring money for the children's support and buy what the children needed.  Francisco would also send clothes from Mexico for the children.  To repay his father, Francisco

---

[3] The Department investigated Edna after receiving allegations of physical abuse in 2000, neglectful supervision in 2002, sexual abuse in 2006, and sexual abuse in 2008.  The Department ruled out the alleged behavior in 2000, 2002, and 2006, and determined in 2008 that cousins alleged to have sexually abused one of the children no longer had access to the child and that Edna was protective of the child.

[4] Francisco testified that he believed he and Edna were divorced because Edna had told him the divorce was final.

would give money to his mother, who remained in Mexico. Edna testified that Francisco was a good father who provided support for the children.

The events leading to this termination proceeding began in January 2009, a few years after Francisco and Edna separated and Francisco was deported, when the Department investigated Edna for neglectful supervision. The Department ultimately determined that Edna was giving the children Tylenol PM to make them sleep and taking her mother's prescription pain medication. In February 2009, Edna gave birth to her fifth child, whose low birth weight triggered a referral to the Department by the hospital. Two months later, Edna was arrested for a DWI with S.A.L. in the car, which prompted the Department to remove the children. The Department petitioned to terminate both Edna's and Francisco's parental rights.[5]

In its combined permanency plans and permanency progress reports, the Department permitted Francisco one visit per month by conference call. *See* TEX. FAM. CODE §§ 263.3025, .303. The trial court's orders did not provide for visitation, other than by incorporating by reference recommendations from the Department. Nothing in the record provides further details on the Department's efforts to facilitate the monthly conference calls, except that the Department's reports indicate that Francisco was compliant in his response and communication with the Department, kept in regular contact with the caseworker, and participated in the scheduled conference calls with his children, "which have been positive for both parties." Although Francisco was initially able to

---

[5] The Department's original petition generically identified Francisco as the father of one of the children and stated that his address was unknown. Three days later, the Department amended its petition to identify Francisco as the father of J.A.C. and S.A.L., but continued to state that his address was unknown. Francisco was later served by certified mail in Mexico. The Department also successfully sought to terminate the parental rights of the fathers of Edna's other children. Those fathers did not appeal the trial court's termination order.

4

participate in the monthly conference calls with his children, he was unable to speak to the children once the foster parents moved the four older children, including J.A.C. and S.A.L., to Bryan in the four months before trial.[6] Francisco testified that he would call the Department office but no one would answer. Francisco testified that it was Edna, and not the Department, who informed him that the foster family had moved the children.

There is no evidence that Francisco was subject to any child support order either before or after the children were removed to foster care. The Department never requested support or undertook an evaluation of Francisco's means, nor did the Department offer Francisco a service plan. The Department's reports state that Francisco had been deported to Mexico because of "criminal activity involving sex with a minor," and he "will need to complete his probation and have restrictions lifted to return to the United States for the Department to evaluate his ability and willingness to provide for the children." Nonetheless, at trial, when Francisco was asked how much support he would be willing to provide for J.A.C. and S.A.L., he asked how much he should send, indicating that he was willing to get a second job if necessary. Francisco attempted to provide support for the children after they were removed to foster care by sending them clothing through his uncle, who traveled to the United States every two weeks.

Alvaro remained a presence in the children's life once the children were placed in foster care. Alvaro regularly visited the children with Edna and their maternal grandmother at the Department's

---

[6] The four older children, including J.A.C. and S.A.L., had been placed with one foster family, while the baby was placed with another.

5

Commerce office, bringing the children food, unless his work schedule interfered. Alvaro testified that he last saw the children a little over a month before trial.

At the bench trial, the Department put on testimony from the following witnesses: Edna, her assigned counselor, the caseworker, the caseworker's supervisor, a CASA volunteer acting as guardian ad litem, and a foster parent caring for Edna's baby. The Department did not call the foster parents caring for J.A.C. and S.A.L. as part of its case. The Department offered one exhibit, a document from Edna's DWI case, and asked the court to take notice of its file, including its reports. The children did not testify, but were brought to court so they could be interviewed by their attorney ad litem, who recommended against terminating Francisco's parental rights. The judge also spoke in chambers with J.A.C.

The caseworker recommended that Francisco's parental rights be terminated, testifying that she had no personal knowledge as to why Francisco was deported and was not aware of his having provided any support for the children in the eighteen months since the case began. The caseworker additionally testified that the children's foster family was committed to keeping them until they aged out. The caseworker indicated that the Department had never entered into a service plan with Francisco because he had been deported to Mexico.

The caseworker's supervisor also recommended that Francisco's parental rights be terminated, adding that the four older children were together in a long-term foster placement, and that the foster parents would have to think about adoption again if that became an option. The CASA volunteer recommended that Francisco's parental rights be terminated as well, reasoning that

6

he had a new wife and family in Mexico, could not return to the U.S. for ten years, by which time the children would be grown, and made too little money to help the children.

Francisco testified over the phone through an interpreter. Francisco stated that he never saw Edna drink, use drugs, or hurt the kids in any manner, and that Edna had been a good mother. Francisco testified that he wanted his children to reside with their mother or his family because they love the children. The only testimony or other evidence concerning Francisco's conviction came from Francisco on direct examination from his counsel:

Q: Okay. Now, you got in trouble in Wisconsin, right?

A: Yes. Correct.

Q: You were having—your girlfriend was underage?

A: Yes. Correct.

The Department asked no questions about this issue on cross-examination. The record does not contain the Wisconsin judgment, probation terms, or the charges brought. The Department presented no evidence concerning the date, circumstances, or offending conduct, or the girl's age. Because Francisco moved to Texas and met Edna in 1996, we can deduce that he was convicted in 1996 or earlier, when Francisco would have been twenty-one years old or younger.

The trial court terminated both Francisco's and Edna's parental rights in a November 18, 2010 order. With respect to Francisco, the trial court found by clear and convincing evidence that termination was in the best interest of J.A.C. and S.A.L., and that Francisco (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being; (2) engaged in conduct or knowingly placed the children with

7

persons who engaged in conduct which endangered their physical or emotional well-being; (3) failed to support the children in accordance with his ability; and (4) constructively abandoned the children. *See* TEX. FAM. CODE § 161.001(1)(D), (E), (F), and (N), (2).

Francisco filed a timely combined motion for new trial and statement of points for appeal that tracked the language of section 161.001(1) (D), (E), (F), and (O) of the Family Code, and also challenged the constitutionality of the statement-of-points statutory requirement.[7] The trial court denied Francisco's request for a new trial, found that Francisco's appeal was not frivolous and a record was necessary, and appointed counsel to represent Francisco on appeal.

A divided court of appeals affirmed the trial court's judgment as to Francisco. __ S.W.3d __, __ (Tex. App.—Texarkana 2011, pet. granted). The court of appeals addressed only the trial court's finding under section 161.001(1)(E) and the best-interest finding, holding that there was factually and legally sufficient evidence to support the findings that Francisco had engaged in conduct that endangered the physical and emotional well-being of the children, and that termination was in the children's best interest. *Id.* at __. Francisco filed a petition for review challenging the

---

[7] Francisco failed to challenge the trial court's finding that he violated section 161.001(1)(N), presumably inadvertently tracking the language of section 161.001(1)(O) in his statement of points. In the court of appeals, Francisco argued that his trial counsel was ineffective for failing to raise the issue of constructive abandonment under section 161.001(1)(N) in the statement of points. The court of appeals did not reach that issue, __ S.W.3d __, __ n.13 (Tex. App.—Texarkana 2011, pet. granted), and the Department does not argue waiver here. Francisco's statement of points also did not attack the trial court's best-interest finding. The Department does not challenge that omission. The Legislature has since repealed the requirement for a statement of points on appeal. *See* Act of May 5, 2011, 82d Leg., R.S., ch. 75, § 5, 2011 Tex. Gen. Laws 75; *see also In re J.O.A.*, 283 S.W.3d 336, 339 (Tex. 2009) (holding that the statement-of-points requirement is unconstitutional as applied when it precludes a parent from raising a meritorious complaint concerning the insufficiency of the evidence supporting a termination order).

legal sufficiency of the evidence as to the trial court's section 161.001(1)(E) and best-interest

findings, which we granted. 55 Tex. S. Ct. J. 461 (Mar. 30, 2012).[8]

## II. Standard of Review

Termination of parental rights requires proof by clear and convincing evidence. This

heightened standard of review is mandated not only by the Family Code, *see* TEX. FAM.

CODE § 161.001, but also the Due Process Clause of the United States Constitution. *See, e.g.*, *In re*

*J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see also Santosky v. Kramer*, 455 U.S. 745, 753–54 (1982)

(recognizing the fundamental liberty interest a parent has in his or her child and concluding that the

state must provide a parent with fundamentally fair procedures, including a clear and convincing

evidentiary standard, when seeking to terminate parental rights). The Family Code defines clear and

convincing evidence as "the measure or degree of proof that will produce in the mind of the trier of

fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM.

CODE § 101.007; *see J.F.C.*, 96 S.W.3d at 264. We strictly construe involuntary termination statutes

in favor of the parent. *In re E.R.*, __ S.W.3d __, __ (Tex. 2012) (citing *Holick v. Smith*, 685 S.W.2d

18, 20 (Tex. 1985)).

We have previously examined the manner in which to apply the clear and convincing

evidentiary standard onto our legal sufficiency review. In *J.F.C.*, we explained:

> In a legal sufficiency review, a court should look at all the evidence in the light most
> favorable to the finding to determine whether a reasonable trier of fact could have
> formed a firm belief or conviction that its finding was true. To give appropriate

---

[8] Edna's parental rights were terminated as to all five children and the court of appeals affirmed the termination. __ S.W.3d at __. Edna petitioned this Court for review as to that judgment, but we denied her petition. 55 Tex. S. Ct. J. 462 (Mar. 30, 2012). Thus, we reverse the court of appeals' judgment only as to Francisco.

9

deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. This does not mean that a court must disregard *all* evidence that does not support the finding. Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.

If, after conducting its legal sufficiency review of the record evidence, a court determines that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally insufficient. Rendition of judgment in favor of the parent would generally be required if there is legally insufficient evidence.

96 S.W.3d at 266; *see also In re J.O.A.*, 283 S.W.3d 336, 344–45 (Tex. 2009).

For a trial court to terminate a parent's right to his children, the State must prove by clear and convincing evidence both that: (1) the parent committed an act prohibited under Texas Family Code section 161.001(1), and (2) termination is in the children's best interest. *See* TEX. FAM. CODE § 161.001(1)–(2). Francisco challenges the court of appeals' holding as to both prongs.[9] We begin by considering whether the evidence is legally sufficient to justify the termination of Francisco's parental rights under section 161.001(1)(E) of the Family Code.

---

[9] The Department contends that Francisco waived his arguments before this Court challenging the legal sufficiency of the evidence as to the endangerment finding. The Department's waiver argument cuts too broadly. A party is entitled to challenge a court of appeals' analysis in this Court, even if the court of appeals primarily focuses on an issue that was not the focus of the party's briefing in the court of appeals (here, its reasons for affirming the trial court's endangerment finding). Further, in both this Court and the court of appeals, Francisco specifically challenged the legal sufficiency of the evidence as to the trial court's endangerment finding.

10

### III. The Evidence Is Legally Insufficient to Support Termination of Francisco's Parental Rights Under Section 161.001(1)(E) of the Family Code

The court of appeals upheld the termination of Francisco's parental rights on grounds that he engaged in conduct or knowingly placed his children with persons who engaged in conduct endangering the physical or emotional well-being of his children. *See id.* § 161.001(1)(E). In considering whether the evidence is legally sufficient to support a finding of endangerment, we must determine whether there was "some evidence of endangerment on which a reasonable factfinder could have formed a firm belief or conviction of endangerment." *J.O.A.*, 283 S.W.3d at 346 (citing *J.F.C.*, 96 S.W.3d at 266). We have held that "endanger" means more than a threat of metaphysical injury or potential ill effects of a less-than-ideal family environment, but that endangering conduct need not be directed at the child. *See Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

The evidence on which the Department relied to prove endangerment was virtually undisputed. In his testimony, Francisco acknowledged that he was convicted in Wisconsin of an offense involving a minor when he was younger, for which he received probation, long before J.A.C. and S.A.L. were born. After he and Edna separated, Francisco attempted to procure a green card and was arrested for violating the terms of his probation and deported. The court of appeals took this limited evidence and surmised an endangering course of conduct, beginning with the offense in Wisconsin and ending in deportation. The court of appeals explained that the trial court could determine that Francisco's inappropriate relationship involving an underage "child" established a voluntary course of conduct in that the series of events ultimately led to the loss of the children's

11

father figure. __ S.W.3d at __. The court of appeals acknowledged that deportation alone is insufficient to establish endangerment, but concluded that it is a fact properly considered given that Francisco's criminal acts subjected the children "to a life of uncertainty and instability, endangering their physical and emotional well-being." *Id.* at __.

While we agree that Francisco's conviction, probation violation, and deportation were all factors to be considered, on the basis of the record evidence before us, no reasonable fact-finder could have formed a firm belief or conviction that Francisco engaged in a course of endangering conduct. First, the Department bears the burden of showing how the offense was part of a voluntary course of conduct endangering the children's well-being, but did not offer evidence concerning the Wisconsin or deportation proceedings, aside from statements in its own reports, which we have set out and the substance of which Francisco does not challenge.[10] The only evidence concerning the conviction came from Francisco's own brief testimony on direct examination. On this record, we cannot determine whether the offense involved a seventeen-year-old girl (as mentioned, Francisco was likely twenty-one or younger when the offense was committed) or someone younger, nor do we

---

[10] The trial court took notice of the Department's reports, which included statements that Francisco had been deported to Mexico because of "criminal activity involving sex with a minor." The Department argues that these statements constitute legally sufficient evidence to support the endangerment finding. The Department also argues that Francisco has waived any argument concerning the trial court's notice of the file by failing to object to the notice. We need not decide whether statements in a report noticed by the trial court can support a finding, nor do we need to determine whether Francisco waived any argument concerning the statements. Even if the statements could constitute evidence supporting a finding, the statements are not legally sufficient evidence. While the statements are certainly very serious, given that the statements supply no details, that Francisco was given a probated sentence, that the events occurred at least eight years before Francisco was deported and at least thirteen years before the Department initiated these termination proceedings, and that in the long interim there is evidence Francisco consistently demonstrated his desire to care and provide for his children, the brief statements in the Department's records cannot be considered clear and convincing evidence of endangerment.

12

know whether the offense in Wisconsin would have constituted an offense under Texas law.[11] The

court of appeals essentially affirmed the trial court's endangerment finding on the basis of

supposition: the court inferred a worst-case scenario involving sex with a "child" that would have

resulted in the endangerment of Francisco's own children. The trier of fact may draw inferences,

but only reasonable and logical ones. *Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 392 (Tex.

1997) (observing that "[t]his Court has held that the trier of fact may draw inferences, but only

reasonable and logical ones," and noting that the evidence relied on may not just be "'meager

circumstantial evidence' which could give rise to any number of inferences, none more probable than

another" (quoting *Blount v. Bordens, Inc.*, 910 S.W.2d 931, 933 (Tex. 1995))); *see also*

*Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 858 (Tex. 1969)

(recognizing that "a vital fact may not be established by piling inference upon inference"). We agree

that an offense occurring before a person's children are born can be a relevant factor in establishing

an endangering course of conduct*, see J.O.A.*, 283 S.W.3d at 345, but the Department bears the

---

[11] Texas and Wisconsin law vary in how unlawful sex with a minor is treated. *Compare* TEX. PENAL CODE § 21.11, *with* WIS. STAT. ANN. §§ 948.02, .09 (West 2012). In Texas, the age of consent is seventeen. *See* TEX. PENAL CODE § 21.11. Texas also provides an affirmative defense if there are consenting parties close in age. *See id.* In Wisconsin, on the other hand, the age of consent is eighteen, and Wisconsin does not provide an affirmative defense for consenting parties who are close in age. *See* WIS. STAT. ANN. § 948.01(1) (West 2012). Wisconsin law makes it a Class A misdemeanor to have "sexual intercourse" with a "child who is not the defendant's spouse" and has attained the age of sixteen. *Id.* § 948.09; *see also id.* § 948.01(1), (6) (defining "child" and "sexual intercourse"). Given Francisco's young age at the time of his conviction, it is possible he would not have been subject to conviction in Texas had the conduct occurred here.

burden of introducing evidence concerning the offense and establishing that the offense was part of a voluntary course of conduct that endangered the children's well-being.[12]

Second, though we agree with the court of appeals that deportation, like incarceration, is a factor that may be considered (albeit an insufficient one in and of itself to establish endangerment), its relevance to endangerment depends on the circumstances. Under the court's reasoning, the mere threat of deportation or incarceration resulting from an unlawful act, regardless of severity, would establish endangerment. We disagree with that analysis. Many offenses can lead to an immigrant's deportation, including entering the country unlawfully. *See, e.g.*, 8 U.S.C. §§ 1227, 1325. Under the court's reasoning, virtually any offense that could lead to deportation—even a minor one committed long before the parent's children were born—would create such an unstable and uncertain environment as to establish endangerment, subjecting countless immigrants to the potential loss of their children. The court's broad reasoning necessarily applies to citizens as well. Any offense committed by a citizen that could lead to imprisonment or confinement would also apparently establish endangerment, simply because the parent's ability to be present in his children's lives would be uncertain. Our nation's Constitution forbids such a far-reaching interpretation of our

---

[12] The Department points to two court of appeals' decisions for the proposition that inappropriate conduct with a minor is a sufficient basis for proving endangerment. Both cases are inapposite. In *In re R.W.*, 129 S.W.3d 732 (Tex. App.—Fort Worth 2004, pet. denied), the father engaged in a long course of conduct that the court of appeals concluded endangered the child, including allegations of child molestation with another child, a long history of drug and alcohol abuse, a long history of mental health issues resulting in hospitalization on several occasions, several felony criminal convictions, and an inappropriate relationship with a minor. *Id.* at 738–44. Though it is unclear from the court of appeals' opinion the father's age at the time of the inappropriate relationship, the relationship in that case was but one in a long string of conduct that was endangering. *Id.* at 743. *In re R.G.* also does not support the Department's argument. *See* 61 S.W.3d 661 (Tex. App.—Waco 2001, no pet.). There, a father continually returned his children to their grandmother's house where sexual abuse was taking place, even after knowing that the abuse was occurring and, later, in contravention of a Department safety plan. *Id.* at 668. *R.G.* also applied an incorrect legal sufficiency standard of review that was later overturned in *J.F.C. Id.* at 667; *see J.F.C.*, 96 S.W.3d at 267.

14

parental rights termination statutes. *See, e.g.*, *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (noting the "extensive precedent" establishing that the Due Process Clause of the Fourteenth Amendment "protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children"); *see also Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) (observing that "the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent"). Here, though Francisco engaged in a criminal act and left Wisconsin without completing his probation before his children were born, there is no evidence that these actions created such uncertainty and instability for his children sufficient to establish endangerment. Nor is there evidence that Francisco abandoned his parental responsibilities once he was forced to leave the country. Instead, the undisputed evidence illustrates that Edna and Francisco lived together as a family unit without apparent incident until they separated, and Francisco and his family remained a regular presence and source of support in the children's lives after he was deported.

We further agree with the court of appeals that there are similarities between incarceration and deportation in that the parent is no longer available to reside with the children in their home in the United States. But there are important differences. Unlike an incarcerated individual, a person who is deported is able to work, have a home, and support a family. More importantly, it is possible for the person's children to live with him.

Although the court of appeals focused on Francisco's conviction involving a minor and subsequent deportation as evidence supporting the trial court's endangerment finding, section 161.001(1)(E) also provides that a parent can engage in an endangering course of conduct if the

15

parent knowingly places the children with persons who engaged in conduct endangering the physical and emotional well-being of the children. The Department does not argue in its brief that Francisco violated this prong, but at oral argument suggested he did on the basis of Edna's endangering actions. It is undisputed that Edna never engaged in endangering conduct, per the Department's own records, until the underlying proceeding, long after Francisco was deported and living in another country. There is simply no evidence that Francisco knowingly placed the children with Edna while she was engaging in endangering conduct, nor is there evidence that Francisco allowed the children to remain with Edna after learning of her conduct. Francisco's uncontroverted testimony was that he was surprised by the instant proceeding and that he had never seen Edna use drugs.

Deportation flowing from an unknown offense occurring many years earlier cannot satisfy the State's burden of proving by clear and convincing evidence that a parent engaged in an endangering course of conduct, nor can mere guesswork undergird such a finding.[13] *See Serv. Corp.*

---

[13] We note that several other courts around the country have considered the relevance of illegal status in this country or deportation in parental rights termination proceedings, with the majority concluding that illegal status and deportation are not in themselves grounds for the termination of parental rights. *See, e.g.*, *In re M.M.*, 587 S.E.2d 825, 832–33 (Ga. Ct. App. 2003) (concluding that the evidence was insufficient to terminate a Mexican's parental rights when the basis was the father's illegal status in this country and the possibility that he could be deported); *In re Doe*, 281 P.3d 95, 102 (Idaho 2012) (concluding that evidence was insufficient to show a deported Mexican father unfit and reversing parental rights termination order); *In re B & J*, 756 N.W.2d 234, 239–40 (Mich. Ct. App. 2008) (concluding that the evidence was insufficient to terminate a Guatemalan's parental rights on the basis of failing to provide proper care or custody for a child after being deported to Guatemala when CPS had reported the parents to immigration authorities); *In re Angelica L.*, 767 N.W.2d 74, 94–96 (Neb. 2009) (concluding that the evidence was insufficient to terminate a Guatemalan's parental rights on the basis of twice failing to provide a child with adequate medical care and subsequent deportation on the basis of living illegally in this country); *Fairfax Cnty. Dep't of Family Servs. v. Ibrahim*, No. 0821-00-4, 2000 WL 1847638, at *2–3 (Va. Ct. App. Dec. 19, 2000) (concluding that termination of a Ghanan's parental rights was unjustified when the father was incarcerated and deported for importing drugs). *But see State Dep't of Children's Servs. v. Ahmad*, No. M2004-02604-COA-R3-PT, 2005 WL 975339, at *1, *3 (Tenn. Ct. App. Apr. 26, 2005) (concluding that evidence was sufficient to terminate a Nigerian's parental rights when the mother was convicted of felony theft, deported, and chose to allow her children to remain in foster care in this country); *In re M.F.*, No. 20080250-CA, 2008 WL 2224277, at *1–2 (Utah Ct. App. May 30, 2008) (concluding that evidence was sufficient to terminate a Mexican's parental rights when the father was incarcerated and deported and had not seen the children or provided support in almost two years); *Perez-Velasquez v. Culpeper Cnty. Dep't of Soc. Servs.*, No. 0360-09-4, 2009 WL

16

*Int'l v. Guerra*, 348 S.W.3d 221, 228 (Tex. 2011) ("If . . . the evidence does no more than create a mere surmise or suspicion and is so slight as to necessarily make any inference a guess, then it is no evidence."). As such, we conclude the evidence is legally insufficient to support termination of Francisco's parental rights under section 161.001(1)(E).[14]

We next evaluate the final prerequisite necessary to support an order terminating a person's parental rights: whether the evidence is legally sufficient to support the trial court's finding that termination of Francisco's parental rights is in the best interest of J.A.C. and S.A.L.

## IV. The Evidence Is Legally Insufficient to Support Termination of Francisco's Parental Rights Under the "Best Interest" Prong in Section 161.001(2) of the Family Code

The Department is required to prove by clear and convincing evidence that termination of a parent's right to his children is in the children's best interest. *See* TEX. FAM. CODE § 161.001(2). In determining whether the evidence is legally sufficient to support a best-interest finding, we "consider the evidence that supports a deemed finding regarding best interest and the undisputed evidence," and ignore evidence a fact-finder could reasonably disbelieve. *J.F.C.*, 96 S.W.3d at 268.

---

1851017, at *2–3 (Va. Ct. App. June 30, 2009) (concluding that evidence was sufficient to terminate a Guatemalan's parental rights when the father was convicted of malicious wounding, incarcerated, and deported).

[14] The court of appeals affirmed the trial court's finding under section 161.001(1)(E) and thus did not reach the trial court's remaining findings under section 161.001(1)(D) (knowingly placed or allowed the child to remain in conditions or surrounding which endangered the child), (F) (failed to support the child in accordance with the parent's ability during a period of one year ending within six months of the date of the filing of the petition), and (N) (constructively abandoned the child who has been in managing conservatorship of Department for not less than six months, and Department has made reasonable efforts to return the child to the parent, the parent has not regularly visited or maintained significant contact with the child, and the parent has demonstrated an inability to provide the child with a safe environment). In this Court, Francisco does not challenge those additional trial court findings. We note, however, that the Department presented the same limited evidence concerning those findings as it did to support the endangerment finding.

We have previously articulated nonexclusive factors to be considered in determining whether termination of parental rights is in a child's best interest:

(1) the child's desires;

(2) the child's emotional and physical needs now and in the future;

(3) any emotional and physical danger to the child now and in the future;

(4) the parental abilities of the individuals seeking custody;

(5) the programs available to assist the individuals seeking custody to promote the best interest of the child;

(6) the plans for the child by the individuals or agency seeking custody;

(7) the stability of the home or proposed placement;

(8) the parent's acts or omissions which may indicate that the existing parent-child relationship is improper; and

(9) any excuse for the parent's acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). Of these, the court of appeals concluded that factors (1), (2), (6), (8), and (9) weighed in favor of termination of Francisco's parental rights, factor (7) was neutral, and factors (3), (4), and (5) weighed against termination. __ S.W.3d at __. We address each in turn.

The court of appeals first reasoned that there was "no evidence that any of the children wanted to live with their father in Mexico" to support its conclusion that the first *Holley* factor weighed in favor of termination. *Id.* at __. But, in doing so, the court incorrectly applied the standard of review and burden of proof. A trial court's best-interest finding must be supported by

18

clear and convincing evidence in the record. *See* TEX. FAM. CODE § 161.001(2). The court of appeals erred in relying on a *lack* of evidence to contradict a finding as if it were evidence supporting the finding. The Department did not introduce evidence that the children would not want to live with their father, nor did the Department controvert Alvaro's testimony concerning the children's wish to stay with their father after their most recent visit. A lack of evidence does not constitute clear and convincing evidence.

As to the second *Holley* factor, the court of appeals stated that the children's emotional and physical needs are great, but did not explain or cite any evidence illuminating how those needs differ from other children or would go unmet if the children were with Francisco. *See* __ S.W.3d at __. As such, we disagree that this factor weighs in favor of termination.

The court of appeals next pointed to Francisco's failure to articulate a plan for the children, beyond allowing the children to return to the mother, as evidence supporting termination under the sixth *Holley* factor. *Id.* at __. While we agree this amounts to some evidence, it is legally insufficient to weigh in favor of termination. As an initial matter, Francisco actually testified that the children should be with their mother *or his family*; thus, it is untrue that Francisco's only plan was for the children to remain with Edna. More importantly, though, there is no indication from the record that the Department considered the possibility of the children living with Francisco in Mexico; Francisco was never offered a service plan. The Department's only post-termination plan for the children was apparently to leave the four older children together with the same foster parents until they age out. Similarly, because the Department never assessed Francisco's situation in

Mexico, there is a lack of evidence establishing the instability of Francisco's home in Mexico pursuant to the seventh *Holley* factor.

The court of appeals stated that there is some evidence that Francisco's acts or omissions rendered the parent-child relationship improper under the eighth *Holley* factor, pointing to Francisco's improper relationship with a minor and deportation. *Id.* at __. But, as discussed, the record is devoid of evidence concerning the offense. We cannot say from this record that Francisco's conviction equates to a risk of his having an inappropriate relationship with his own children. In fact, the undisputed evidence indicates that Francisco's relationship with his children was a good one. Similarly, we disagree with the court of appeals' assertion that Francisco's failure to provide an excuse for "these acts" (presumably referring to the conviction and deportation) under the ninth *Holley* factor supported the trial court's best-interest finding, given that the evidence concerning those "acts" is legally insufficient to support a best-interest finding in the first place. *See id.* at __.

The court of appeals finally concluded that the third through fifth *Holley* factors weighed against termination of Francisco's parental rights, observing that testimony suggested that Francisco was a good father to the children who provided for their needs, and that there was no evidence the Department had programs available to assist Francisco in Mexico. *Id.* at __. We agree with the court's assessment of these three *Holley* factors, except to observe that the Department did not determine whether Mexican programs might be available to Francisco to promote the best interest of his children.

We note that the court of appeals additionally inferred that termination of Francisco's parental rights was in the children's best interest because the Department caseworker testified that

20

Francisco had not provided financial support for or contacted the children, with the exception of a few phone calls, and Alvaro testified it "would be good" if a married couple adopted the children and fed, clothed, and provided them with a good education. *See id.* at __. It appears from the record that any absence of financial support and telephone calls from Francisco was largely a result of the Department's actions. As discussed, the Department did not request court-ordered support, though Francisco provided his children with financial support and clothing on his own initiative. The Department's plans also limited Francisco's visitation to a once-a-month telephone call, and the Department's reports indicate Francisco was always compliant until the Department moved the children without informing him. Finally, the Department presented no evidence that another family wishes to adopt the children, or that the children's foster parents can provide for them in a way Francisco cannot. But, even if the evidence showed the children's foster family to have superior resources to Francisco, we decline to postulate that this would support a best-interest finding. *See, e.g.*, *In re Doe*, 281 P.3d 95, 102 (Idaho 2012) ("The fact that a child may enjoy a higher standard of living in the United States than in the country where the child's parent resides is not a reason to terminate the parental rights of a foreign national."); *In re Angelica L.*, 767 N.W.2d 74, 94 (Neb. 2009) ("[T]he fact that the State considers certain adoptive parents . . . 'better' . . . does not overcome the commanding presumption that reuniting the children with [their mother] is in their best interests—no matter what country she lives in . . . . [T]his court has never deprived a parent of the custody of a child merely because on financial or other grounds a stranger might better provide." (internal citations omitted)).

In sum, we conclude that no reasonable fact-finder could have formed a firm belief or conviction that termination of Francisco's parental rights was in the children's best interest, and the court of appeals erred in holding otherwise. *See* TEX. FAM. CODE § 161.001(2); *J.F.C.*, 96 S.W.3d at 272. We do not conclude that the children's best interest is unquestioningly for them to join their father in Mexico; it is possible that the children's best interest is to remain in the United States, whether in foster care or with Alvaro or another family member.[15] But the Department is required to meet its burden of proof, and the evidence introduced at trial fails, at this juncture, to support the Department's burden as to the best-interest finding.

## V. Conclusion

Due process commands that courts apply the clear and convincing evidentiary standard in parental rights termination cases. *Santosky*, 455 U.S. at 769; *J.F.C.*, 96 S.W.3d at 263; *see also In re B.G.*, 317 S.W.3d 250, 257 (Tex. 2010) (observing that a parental rights termination case implicates "fundamental liberties" and "a parent's interest in maintaining custody of and raising his or her child is paramount" (quoting *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003))). The Department is required to support its allegations against a parent by clear and convincing evidence; conjecture is not enough. Because the evidence is legally insufficient to support the trial court's order terminating Francisco's parental rights under section 161.001, we hold that the court of appeals erred in affirming the trial court's order as to Francisco. On remand, the Department has several options to consider, including offering Francisco a service plan to assess whether it would be feasible and

---

[15] It is unclear whether Alvaro remains in the United States. Alvaro testified that he may return to Mexico.

22

appropriate for him to have custody of his children, and allowing Francisco an opportunity to comply with the plan. *See, e.g.*, TEX. FAM. CODE §§ 263.101–.106. The fact that Francisco resides in Mexico should not seriously hamper the Department's efforts. *See, e.g.*, *Angelica*, 767 N.W.2d at 86–87 (discussing State of Nebraska's coordination with the Guatemalan consulate and agencies for the purpose of conducting a home study and determining whether sufficient services exist in Guatemala to monitor and protect the well-being of the children). We reverse the court of appeals' judgment in part and remand the case to the trial court for further proceedings in accordance with this opinion. *See* TEX. R. APP. P. 60.2(d).

_____

Paul W. Green
Justice

OPINION DELIVERED:  October 12, 2012

23