

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-14-00404-CV

IN THE INTEREST OF M.N., V.W.,
AND Z.W., CHILDREN

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 323-98616J-13

----------

## MEMORANDUM OPINION[1]

----------

Appellant P.N. (Mother) appeals from the trial court's order terminating her

parent-child relationships with her children M.N., V.W., and Z.W. In one issue,

she contends that the evidence is legally and factually insufficient to support the

---

[1]*See* Tex. R. App. P. 47.4.

trial court's endangerment findings.[2] Because we hold that the evidence is legally and factually sufficient to support the trial court's judgment, we affirm the trial court's judgment.

As we have previously explained,

> Endangerment means to expose to loss or injury, to jeopardize. The trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endanger the physical or emotional well-being of the child. Under subsection (D), it is necessary to examine evidence related to the environment of the child to determine if the environment was the source of endangerment to the child's physical or emotional well-being. Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child.
>
> . . . . Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical or emotional well-being was the direct result of the parent's conduct, including acts, omissions, and failures to act. . . .
>
> To support a finding of endangerment, the parent's conduct does not necessarily have to be directed at the child, and the child is not required to suffer injury. The specific danger to the child's well-being may be inferred from parental misconduct alone. . . . As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being.
>
> Additionally, a parent's mental state may be considered in determining whether a child is endangered if that mental state allows

---

[2]*See* Act of Mar. 30, 2015, 84th Leg., R.S., S.B. 219, art. 1, § 1.078, sec. 161.001(b)(1)(D)–(E) (West) (to be codified as an amendment to Tex. Fam. Code Ann. § 161.001).

2

the parent to engage in conduct jeopardizing the child's physical or emotional well-being.[3]

We have also stated that "[a]busive or violent conduct by a parent may produce an environment that endangers the child's physical or emotional well-being."[4]

Margaret Ray, who was a night response investigator for the Texas Department of Family and Protective Services (TDFPS) at the time of the removal, testified that she had completed an investigation regarding physical child abuse of the children and later completed an affidavit based on the investigation on June 12, 2013.  She testified that TDFPS had received an intake stating that Mother had hit then ten-year-old Z.W. with an Ethernet cable and a belt, resulting in injuries.  The police had responded, and Z.W. had been taken to an Arlington hospital for a panic attack.  Ray visited Z.W. at the hospital before his release that same evening.  She saw red marks at his temples, on both shins, and on his arms.  The marks were combinations of lines and marks.  Ray testified that Z.W.'s description of what had happened to him appeared to be consistent with his injuries.

After speaking with Z.W., Ray went to Mother's apartment to talk to her and the other children:  M.N., who was fourteen years old at the time, and V.W.,

[3]*In re L.E.M.*, No. 02-11-00505-CV, 2012 WL 4936607, at *2 (Tex. App.—Fort Worth Oct. 18, 2012, no pet.) (mem. op.) (citations and internal quotation marks omitted).

[4]*In re S.G.*, No. 02-14-00245-CV, 2015 WL 392772, at *5 (Tex. App.—Fort Worth Jan. 29, 2015, no. pet.) (mem. op.).

who was a week shy of twelve years old. The other children's descriptions of how Z.W. was injured were consistent with his explanation. Ray did not see any physical injuries on M.N. or V.W.

Mother told Ray that the children had lived with her when they were young but that they had been living with their godmother for the last nine and one-half years. Mother also told Ray that the children had been living with her only about two weeks. The children told Ray why they had only been with Mother for two weeks, but that evidence does not appear in the reporter's record. Based on Ray's investigation, the children were removed that night.

Officer Jonlee Martinez of the Arlington Police Department testified that on the night of June 11, 2013, the police department received a 911 call for a welfare check at Mother's apartment. A neighbor heard a child screaming and a lot of banging around and was afraid for the child. The neighbor reported that the child might have been disciplined, but the neighbor was not sure. When Mother let Martinez in, he found ten-year-old Z.W. lying on a pallet in the dark, crying and shaking. The officer saw "red marks all up and down [Z.W.'s] arms and his legs" and also saw that Z.W.'s skin was broken in places. Martinez also described the "marks" as "welts."

Mother admitted to the officer that she had beaten the child continuously for twenty minutes, first with an Ethernet cable, which broke, and then with a belt, after he had said that her boyfriend's uncle, seen in a photograph, looked like Freddy Krueger and refused to apologize to her. Mother was upset, she told the

4

officer, because the uncle and she are both disabled.  Martinez noticed that Mother had trouble walking.

While the officer was in the apartment, Z.W. began to have trouble breathing and talking and appeared to be having a panic attack.  He was "[h]yperventilating, kind of freaking out, [and] very scared."  He was taken to the hospital by EMS.

The officer did not see any noticeable bruises or marks on the other two children.

Martinez testified that Mother was not arrested that night but that he believed that she was later arrested and charged with injury to a child.

Therapist Rose Obaze treated the three children and was still treating M.N. at the time of trial.  She testified that all three children were "extremely aggressive," "defiant," and "just out of control, period, at school and at home" when she first met them in January 2014, more than six months after the removal.  "[T]hey all had problems at school.  They were aggressive.  They were not cooperative.  They were disruptive in the classroom."  Obaze tried to teach them coping skills to control their anger.  She saw no progress with V.W. and only short-lived progress with Z.W.

M.N. had broken a girl's nose while riding the school bus and was on probation at the time of trial.  Obaze testified, though, that he had shown improvement and was using the coping skills that he had learned from her.  At the time of trial, M.N. was living in a therapeutic foster care placement, receiving

5

weekly therapy from Obaze, and seeing a psychiatrist quarterly for his medications. Obaze testified that M.N. needed parents who were trained to deal with his issues and who would require him to go to school and be responsible. She also testified that he needed an environment where he could receive services.

Z.W. was in a residential treatment center (RTC) at the time of trial. He had a history of being physically aggressive, breaking rules, and not listening to his teachers. He had also been suspended several times. His RTC counselor, Terrence Scott, testified that Z.W. had been diagnosed with "oppositional defiance disorder," "latent (indiscernible) disorder episode single moderate (sic)," ADHD, "parent-child relational problems," and "physical abuse of a child as a victim." Scott explained that "oppositional defiance" is "being noncompliant with rules, disrespectful to authority figures, arguing with adults, you know, causing trouble at school and home and, you know, losing [one's] temper and placing blame on others." Scott stated that the rewards-and-punishment criteria using the behavioral level system at the RTC were working well with Z.W. because he enjoyed playing basketball and video games and understood that he had to earn those rewards. Scott testified that going forward, Z.W. would need a structured and therapeutic environment with regular monitoring and that he and his caregivers would need ongoing therapy to manage his psychological challenges and deal with his behaviors "to continue any progress that he ha[d] developed" at the RTC.

6

Scott testified that Z.W. had admitted that Mother had neglected or abused him but had not yet discussed specifics of the abuse.

Scott also testified that Z.W.'s global assessment of functioning (GAF) score currently ranged from 35–40, on a scale of 10–90; that someone with that score typically would have been placed in the RTC for noncompliance, aggression, and poor impulse control; and that such a child would need constant supervision. Scott admitted, though, that a GAF can improve over time with the right environment.

V.W. lived at a different RTC. Her counselor, Jerrie Smith, testified that V.W. was mildly mentally retarded with an I.Q. of 69. Smith testified that V.W. had problems with anger management, depression, and stress management. When she was physically aggressive, she pulled hair, pushed, kicked, and cursed. Smith testified that V.W. is a concrete thinker who would need to live in a structured, disciplined environment with a consistent schedule and expectations. Tasks would need to be given one or two steps at a time, not globally. "[S]he cannot be in a home that is going to be chaotic or not structured."

Smith also testified that V.W. told her about Mother's beating Z.W.; that V.W. reported to Smith that she had been "very afraid"; and that "whenever [V.W.] talk[ed] about the situation, [Smith could] tell that it was a trauma for her." V.W. told Smith that Mother had "spanked" her but denied that Mother had physically abused her.

7

Ashley Dabbs, CPS Specialist II, testified that the children were removed because Z.W. "receiv[ed] multiple beatings during the course of a week." Initially, TDFPS's goal was family reunification. To achieve that goal, TDFPS wanted Mother to show that she could provide for the children and "demonstrate history and flexibility towards the kids' concerns as well as their diagnos[e]s."

Dabbs testified that Mother was unemployed and suffered from a schizophrenic disorder. Mother told Dabbs that she received disability payments but did not provide Dabbs with access to her complete medical records or proof of income.

Dabbs testified that nothing in Mother's new home showed her ability to care for the children there. Dabbs had told Mother that each child needed his or her "own bed setups, that they [needed to] have their own dressers, their place to put their things[,] and that [the home needed to be] adequate enough for all of them to live there together." Dabbs testified that she had told Mother that the children could share a room and that their spaces did not necessarily have to be in a bedroom. Dabbs visited the two-bedroom duplex that Mother shared with her boyfriend and his parents. The only space available was Mother's bedroom, which was cluttered with her own belongings. "The home was not set up as for her to be expecting children."

Dabbs also testified that she had expected to see Mother show flexibility; that is, "[a]ll three children require[d] some form of therapeutic care[,] and [Dabbs had expected Mother] to set up services, school, [and] after-school programs;

8

explain to [Dabbs] what [Mother] would do differently; how she would discipline; [and] what she would use[—] . . . her daily routine." Dabbs testified that she was completely honest with Mother about the children's behavior since the removal. Mother told Dabbs that "she understood all that but they just needed Jesus and that they would be going to Bible study classes and stuff like that." Mother was never able to develop a schedule for the children to follow in the home or to articulate to Dabbs that she had an ability to do that.

According to Dabbs, during supervised visits with the children, Mother did not show that she could manage their needs, nor did she show that she could address their behavior effectively without anger or physical discipline. Mother would not go to the children's aid when they cried, and she said things to them during visits that upset them. Dabbs said Mother was unwilling to use some of the RTC techniques for discipline because she could not figure out how to reward one or two of the children but exclude the child who had not earned the reward. Dabbs also testified that Mother had "not demonstrated that she[ would] be able to handle the children if they[ were] returned to her and provide for them." Dabbs did not believe that Mother was capable of caring for the children at the time of trial because she had not demonstrated that she could care for them. Dabbs testified,

> I have no proof of how she receives money; where she's staying at; are they going to have a roof over their shelter (sic); is there going to be food; what schools were they going to; are they going—is she going to be able to manage their medications, is she going to be able to get them back and forth to therapy sessions, to medication

9

managements; to relate the information that they're having with their medications and understand what's going on with the kids.

Dabbs said the children were "having a hard time with understanding being [taken] from a place that they call[ed] home [with their godmother] and trying to rebuild that same connection with their mother." Dabbs testified that the children had no emotional connection to Mother and did not want one.

Thus, the trial court heard that

- Mother had not actively parented the children for nine and one-half years before they began living with her again;

- The emotional distance between Mother and the children was so great that the children felt no emotional connection at all;

- within two weeks after their return to her, she had beaten the youngest of them multiple times during one week, injuring him physically and scaring both him and his older sister;

- Mother was thereafter arrested for injury to a child;

- the home environment at the time of the removal and the home environment that Mother was in at trial did not offer the children any space to call their own;

- all three children had behavioral issues and psychological disorders;

- Mother did not understand the importance of structure and routine to the children despite being told about it;

- Mother could not handle the children; and

- Mother had a schizophrenic disorder.

The trial court noted that Mother was at the courthouse the day of the trial but did not stay for trial.

10

Based on the appropriate standards of review, we hold that the evidence is legally[5] and factually[6] sufficient to support the trial court's endangerment findings against Mother. We overrule her sole issue.

Having overruled Mother's sole issue, we affirm the trial court's judgment.

PER CURIAM

PANEL: DAUPHINOT, GARDNER, and WALKER, JJ.

DELIVERED: May 28, 2015

---

[5]*See In re E.N.C.*, 384 S.W.3d 796, 808 (Tex. 2012); *In re J.P.B.*, 180 S.W.3d 570, 573–74 (Tex. 2005).

[6]*See In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014); *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).