

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-24-00026-CV

_____

IN THE INTEREST OF M.G., A CHILD

On Appeal from the 360th District Court
Tarrant County, Texas
Trial Court No. 360-712943-22

Before Sudderth, C.J.; Birdwell and Bassel, JJ.
Memorandum Opinion by Chief Justice Sudderth

**MEMORANDUM OPINION**

Following a bench trial, the trial court terminated Appellant R.A.'s (Mother's) parental rights to her son, Marty.[1]  Mother appeals,[2] arguing that (1) the trial court erred by denying her motion for Marty to be placed with a family member, and (2) the evidence was legally and factually insufficient to support the finding that termination was in Marty's best interest.

We will affirm.

## I.  Factual Background

Marty's situation first came to the attention of the Department of Family and Protective Services in February 2023 following his birth while he was still in the hospital and testing revealed that Mother's urine was positive for amphetamines and marijuana.  Marty remained in the neonatel intensive care unit because of concern that he was at risk for drug withdrawal and because there had been a placental abruption due to his Mother's drug use.  An investigator spoke to Mother who admitted that she used methamphetamines during her pregnancy with Marty.  Mother gave the name of her great-grandmother as a possible placement.  However, the great-grandmother was unable to take care of herself and would have had to rely on Mother to help.  That

---

[1]We use an alias for the child throughout this opinion. *See* Tex. R. App. P. 9.8(b)(2).

[2]The parental rights of an unknown father were terminated, and the case of another possible father was severed and will be dealt with in a future proceeding. Neither person is a party to this appeal.

was unacceptable to the Department. At that time, Mother did not give the name of another relative for possible placement.

Marty was eventually placed with foster parents.[3] In the meantime, Mother was testing negative for illegal drugs and was on the path to completing court-ordered services. She was living with her mother and her nieces and nephews in a home in Waco.[4]

By early 2023, the Department was working toward a monitored return of Marty to Mother, and by spring Mother was allowed to have unsupervised visits with Marty. Because of transportation problems, several visits were "virtual," while only a few were in person. By June of 2023, Marty was alternating weeks between staying with Mother and his foster parents.

In July, however, Marty's foster mother sent the caseworker photographs showing bruising to Marty's face, including a black eye. When asked about the injuries, Mother explained that Marty fell on a toy car and hit his face. At that point, the caseworker was not "overly concerned," but the next week, Marty returned from a visit to Mother with bruising on both of his cheeks and his earlobes. This time, Mother said that Marty's sister had "sucked on his earlobe" but failed to give any

---

[3]The foster parents intervened in the case and participated at trial, but they did not file a brief on appeal.

[4]Mother's sister could not be with her own children because she had a drug-related, open child-welfare case.

explanation for what happened to Marty's cheeks. Later, Mother told the caseworker that either the transporter or the foster parents must have caused the bruising. Further investigation revealed that Marty had also suffered bruising to his penis. Mother claimed to know nothing about that injury, but she also said that "it may be from a lactose allergy." In the caseworker's opinion, Mother's explanations were not reasonable, so the Department decided to end Marty's unsupervised visits with Mother and to cancel any plans for a monitored return.[5]

About a month before trial, Mother suggested to the caseworker that her cousin was a possible placement for Marty. The caseworker spoke with this cousin, who informed the caseworker that she had not heard from Mother in more than ten years. The caseworker was concerned that this cousin had no relationship with Marty and, further, that she did not "understand [that removing Marty from his foster home would] be a trauma on [him] and that it would have an [e]ffect on him." The caseworker was also concerned that the cousin would do nothing to prevent Mother from having unsupervised access to Marty.

At trial, Mother explained again her theories regarding Marty's injuries and her belief that it was more important for Marty to be removed from the foster parents—

---

[5]In addition to the bruising, the caseworker discovered that Mother's sister (whose past drug use and child-endangerment history should have prevented her from contact with Marty) was actually living with Mother in the house in Waco. This concerned the caseworker as well. In her opinion, Marty should not be returned to Mother because his safety would be in jeopardy.

4

the only home he had known—and placed with her cousin with whom he had no connection. As to her lack of contact with her cousin, Mother testified that she video-chats with her cousin during the holidays.

The trial court terminated Mother's parental rights, finding true the allegations of environmental endangerment, conduct-endangerment, that Mother caused Marty to be born addicted to a controlled substance, and that termination would be in Marty's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (R), (b)(2). The trial court also denied Mother's motion for placement with her cousin.

## II. Motion for Placement With Relative

In her first issue, Mother complains that the trial court erred by refusing her request that Marty be placed with her cousin. The Department responds that the trial court's decision served Marty's best interests. We agree with the Department.

About a month before trial, Mother filed a motion asking that Marty be placed with her cousin. The trial court made its decision about placement based on the evidence that was advanced at trial:

- At the time of trial, Marty had been living with the foster parents for nearly two years.

- Although Mother and her cousin occasionally had video chats, they had not seen each other in person for at least nine years.

- The cousin was unaware of the possible trauma that Marty could experience by being uprooted from the only home he had known since he was three weeks old.

5

- The Department was concerned that the cousin would allow Mother unsupervised contact with Marty.

"Reasonable efforts should be made with respect to a child to be placed in foster care to preserve and reunify families and to give preference to an adult relative over a non-related caregiver in determining the placement of a child." *In re K.W.*, No. 2-09-041-CV, 2010 WL 144394, at \*10–11 (Tex. App.—Fort Worth Jan. 14, 2010, no pet.) (mem. op.); *see* Tex. Fam. Code Ann. § 262.114(d) (requiring the Department to give preference to the child's relatives in making a placement decision). But there is no legal obligation on the Department's part to place a child with a relative before a parent's parental rights may be terminated. *See In re G.B.*, No. 06-20-00031-CV, 2020 WL 4589761, at \*2 (Tex. App.—Texarkana Aug. 11, 2020, no pet.) (mem. op.). Further, the establishment of a "stable, permanent home" is a paramount consideration in determining best interest. *In re G.A.C.*, 499 S.W.3d 138, 141 (Tex. App.—Amarillo 2016, pet. denied).

Given the evidence at trial, the trial court did not abuse its discretion by refusing to place Marty with Mother's cousin. Most important, "we may not discount or minimize the level of permanence [Marty] has achieved with his foster family." *In re J.W.*, 645 S.W.3d 726, 747–48 (Tex. 2022). Marty's current permanency supervisor testified that his foster family is the only family that he knows and that he has "no relationship" with Mother's cousin. The trial court acted within reasonable bounds by determining that Marty's best interest would not be served by taking him away from

his foster parents and delivering him to Mother's cousin. *See In re K.W.*, 2010 WL 144394, at *10–11 (affirming trial court's decision to terminate parental rights instead of placing child with relative "based in part on the stability and strength of the relationship between K.W. and his foster family"). In addition, the trial court was entitled to believe and give weight to the caseworker's testimony that the cousin might not prevent Mother from unsupervised access to Marty.

We overrule Mother's first issue.

### III. Best Interest

In Mother's second issue, she attacks the legal and factual sufficiency of the evidence supporting the trial court's finding that termination was in Marty's best interest. We hold that the evidence was both legally and factually sufficient.

### A. Legal and Factual Sufficiency

In evaluating the evidence for legal sufficiency to support a best-interest finding, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the Department proved the termination is in the child's best interest. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).[6] We review all the evidence in the light most favorable to the finding and judgment, and we resolve any

---

[6]The Department must prove by clear and convincing evidence that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *E.N.C.*, 384 S.W.3d at 802.

disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We also must disregard all evidence that a reasonable factfinder could have disbelieved, in addition to considering undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* In doing our job, we cannot weigh witness-credibility issues that depend on the witness's appearance and demeanor because that is the factfinder's province. *Id.* And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.*

In determining whether the evidence is factually sufficient to support a best-interest finding, we must perform "an exacting review of the entire record." *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the verdict with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether a factfinder could reasonably form a firm conviction or belief that termination was in the child's best interest. Tex. Fam. Code Ann. § 161.001(b)(2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

**B. Termination was in Marty's Best Interest**

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). Evidence probative of a child's best interest may be the same evidence that is probative of a Subsection (b)(1) ground. *Id.* at 249; *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2). We also consider the evidence considering nonexclusive factors that the factfinder may apply in determining the child's best interest:

- the child's desires;

- the child's emotional and physical needs now and in the future;

- the emotional and physical danger to the child now and in the future;

- the parental abilities of the individuals seeking custody;

- the programs available to assist these individuals to promote the child's best interest;

- the plans for the child by these individuals or by the agency seeking custody;

- the stability of the home or proposed placement;

- the parent's acts or omissions that may indicate that the existing parent–child relationship is not a proper one; and

- the parent's excuse, if any, for the acts or omissions.

9

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013) (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors"); *E.N.C.*, 384 S.W.3d at 807. These factors do not form an exhaustive list, and some factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may suffice in a particular case to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of paltry evidence relevant to each factor will not support such a finding. *Id.*; *In re J.B.*, No. 02-18-00034-CV, 2018 WL 3289612, at *4 (Tex. App.—Fort Worth July 5, 2018, no pet.) (mem. op.).

First, Marty was too young at the time of trial to communicate his desires. This factor would normally be neutral, *see In re C.W.*, No. 02-23-00414-CV, 2024 WL 637264, at *9 (Tex. App.—Fort Worth Feb. 15, 2024, pet. denied) (mem. op.), but when the evidence also shows that, as in this case, a child has bonded with his foster parents and has spent minimal time with his parent, this factor can weigh in favor of termination, *see In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("When children are too young to express their desires, the [factfinder] may consider that the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with a parent."). Because the evidence showed that Marty has bonded with his foster parents, this factor weighs slightly in favor of termination.

A child needs long-term safety and stability. Thus, the child's physical and emotional needs are of paramount importance. *See* Tex. Fam. Code Ann. § 263.307(a) ("[T]he prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest."). The evidence at trial indicated that Marty's current placement is safe and stable, that the foster parents are meeting his needs now and, in the opinion of Marty's caseworker, will continue to do so in the future. By contrast, during Mother's case, Marty sustained bruising to his eye, forehead, ears, and penis. *See In re A.A.C.*, No. 01-23-00278-CV, 2023 WL 6466830, at *7 (Tex. App.—Houston [1st Dist.] Oct. 5, 2023, pet. denied) (mem. op.) (holding in part that suspected physical abuse favored termination because it showed instability of mother's home). This physical abuse, and Mother's unconvincing explanation for his injuries, underscore the fact that even if Mother did not inflict the injuries to Marty herself, she cannot keep him safe. Because the evidence shows that Mother is unable to provide an environment conducive to Marty's present and future emotional and physical needs, this factor weighs in favor of termination. *See In re S.S.*, No. 13-14-00433-CV, 2015 WL 234069, at *8 (Tex. App.—Corpus Christi–Edinburg Jan. 15, 2015, no pet.) (mem. op.); *see also In re L.P.*, No. 07-17-00155-CV, 2017 WL 4173641, at *4 (Tex. App.—Amarillo Sept. 20, 2017, pet. denied) (mem. op.) (holding that physical abuse to a child engenders emotional needs greater than that of other children).

As for the Department's plans for Marty, his foster parents are adoption-motivated. They have also taken advantage of programs and therapies offered by the Department. According to the evidence, Marty received ECI[7] during his first year, and he was successfully discharged from that program. The foster parents also alerted to the fact that Marty was having trouble speaking. Although his doctors originally had no concerns, Marty was eventually reassessed and is now receiving speech therapy. As a result, Marty's vocabulary has improved. Because the evidence shows that the foster parents demonstrate solid parental abilities and have taken advantage of programs and therapies available to Marty, this factor favors termination.

As to the final factor—Mother's excuses for acts or omissions—Mother told conflicting stories to her caseworker about Marty's bruises. At first, Mother told the caseworker that Marty's sister had sucked on his earlobes causing the bruises. Later, she said that either Marty's transporter or his foster parents must have caused the bruising. At trial, Mother advanced both excuses. She also attributed the bruising of his penis to a lactose allergy. The trial court was entitled to disbelieve Mother's excuses and to find that this weighed in favor of termination. *See In re D.A.*, No. 02-14-00076-CV, 2014 WL 3778234, at *26 (Tex. App.—Fort Worth July 31, 2014, no pet.) (mem. op.).

---

[7]We presume that ECI refers to "early childhood intervention," a program for children with developmental delays. *See In re H.B.C.*, No. 05-19-00907-CV, 2020 WL 400162, at *3 n.4 (Tex. App.—Dallas Jan. 23, 2020, no pet.) (mem. op.).

Given Marty's injuries, the stability of his foster home, and Mother's unsatisfactory explanations, the evidence was sufficient for the trial court to find by clear and convincing evidence that termination of Mother's parental rights was in Marty's best interest. We therefore overrule Mother's second issue.

## IV. Conclusion

Having overruled Mother's issues, we affirm the trial court's judgment.

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Delivered: June 27, 2024

13