

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-14-00162-CV

IN THE INTEREST OF D.D., A CHILD

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 323-98683-J13

----------

## MEMORANDUM OPINION[1]

----------

Appellant D.E. (Father) appeals the trial court's order terminating his parental rights to his son, D.D. (Dustin).[2] Father challenges the trial court's order only on the grounds that the evidence is legally and factually insufficient to prove that termination of his parental rights is in Dustin's best interest. We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

[2]To protect D.D.'s anonymity, we will use "Dustin" as his alias. *See* Tex. Fam. Code Ann. § 109.002(d) (West 2014); Tex. R. App. P. 9.8(b)(2).

## Background Facts

L.D. (Mother) prematurely gave birth to Dustin in June 2013 after using methamphetamine on the same day. At that time, Father was incarcerated for assaulting Mother. Mother initially denied the voluntary use of illicit drugs and told the Department of Family and Protective Services (the Department) that Father had held her captive in a hotel room, had forced her to take drugs, and had tried to kill her when she attempted to leave. Father denied these events. Mother eventually admitted to voluntarily using drugs while pregnant with Dustin.

After Dustin's birth, the Department received a report that Mother had tested positive for amphetamines. Post-birth testing of Dustin's meconium likewise returned positive for amphetamines.

The Department filed a petition alleging that Dustin was in immediate danger, asking to be designated as his temporary sole managing conservator, and seeking the termination of Mother's and Father's parental rights if reunification could not be achieved. The Department attached an affidavit to its petition averring that Mother and Dustin had tested positive for illegal drugs upon Dustin's birth and that Father was incarcerated for assault. The trial court named the Department as Dustin's temporary sole managing conservator. The Department placed Dustin in foster care after exhausting its search for suitable placements with family members.

Following Dustin's placement, the Department filed its first service plan. The plan set out a goal of family reunification and assigned tasks to Mother and

Father, including meeting Dustin's basic health and safety needs, abstaining from drug and alcohol use or gang involvement, and completing counseling and parenting classes. Mother and Father acknowledged the terms of the plan.

From August 2013 to April 2014, the Department monitored the parents' compliance with the plan. In December 2013, the Department informed the trial court that Father had reported completion of a mental health assessment (a requirement of the plan) and that he had plans to enroll in a "[Batterer's] Intervention Program." Later, the Department reported to the court that Father remained incarcerated and had "not reported any additional services rendered."

In April 2014, when Dustin was less than a year old, the trial court held a bench trial. Father personally appeared through a bench warrant. The trial court terminated his parental rights to Dustin and appointed the Department as permanent managing conservator. Father brought this appeal.[3]

## Dustin's Best Interest

Father argues only that the evidence is legally and factually insufficient to support the trial court's finding that termination of the parent-child relationship is in Dustin's best interest. In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West

---

[3]The trial court also terminated Mother's parental rights, but she has not appealed.

3

2014); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)). We strictly scrutinize termination proceedings in favor of the parent. *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012); *E.R.*, 385 S.W.3d at 554–55; *Holick*, 685 S.W.2d at 20–21.

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001, .206(a) (West 2014); *E.N.C.*, 384 S.W.3d at 802. "[C]onjecture is not enough." *E.N.C.*, 384 S.W.3d at 810. Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see also E.N.C.*, 384 S.W.3d at 802. Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014); *E.N.C.*, 384 S.W.3d at 802.

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the challenged ground for termination was proven. *In re J.P.B.,* 180 S.W.3d 570, 573 (Tex. 2005). We

review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* "A lack of evidence does not constitute clear and convincing evidence." *E.N.C.*, 384 S.W.3d at 808.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that termination of Father's parental rights is in Dustin's best interest. *See* Tex. Fam. Code Ann. § 161.001(2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2014). In

5

determining the best interest of the child, we may consider, among other factors, the desires of the child, the emotional and physical needs of the child now and in the future, the emotional and physical danger to the child now and in the future, the parental abilities of the individuals seeking custody, the programs available to assist these individuals to promote the best interest of the child, the plans for the child by these individuals or by the agency seeking custody, the stability of the home or proposed placement, the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one, and any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *E.N.C.* 384 S.W.3d at 807; *see In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013) (stating that in reviewing a best interest finding, "we consider . . . the *Holley* factors" (footnote omitted)).

Father argues that there is insufficient evidence indicating that he poses a physical and emotional danger to Dustin. But the evidence illustrates Father's pattern of violence toward others and that the violence endangered Dustin in the past and could be dangerous to him in the future. Specifically, in December 2012, while Mother was pregnant with Dustin, police arrested Father for causing bodily injury to her by punching her, throwing her to the ground, and choking her.[4] Father pled guilty to assault on a family member, a Class A misdemeanor, and a trial court sentenced him to forty-five days' confinement.

---

[4]Prior to this arrest, in 2008, Father was convicted of two counts of burglary of a habitation and sentenced to four years' confinement.

Following the incident, a trial court issued a protective order against Father. He violated the protective order two months later (in February 2013) when the police arrested him for a disturbance at Mother's residence.[5] Father eventually pled guilty to violating the protective order, was convicted of that offense, and received a sentence of ninety days' confinement.

In March 2013, while Mother was still pregnant with Dustin, the police arrested Father again for assaulting her. An indictment that the trial court admitted alleged that he had bit her, had pulled her hair, had grabbed her, and had impeded her breathing and circulation by applying pressure to her throat or neck. At the time of the incident, Mother informed the police that she was approximately five months pregnant. Father again pled guilty to assaulting Mother. Because of Father's prior conviction for assaulting Mother, upon his third-degree-felony conviction for the March 2013 assault, the trial court sentenced him to three years' confinement. Father was incarcerated for this charge at the time of the termination trial.

While incarcerated, Father continued engaging in violence. For example, he was involved in a physical altercation with two jail guards, Officer Christopher Rynkowski and Officer J. Brown. Officer Rynkowski testified that Father had failed to comply with orders to stay within a designated walking area and then

---

[5]According to Father's testimony at the termination trial, Mother's brother shot him on this day. Father testified that he confronted Mother's brother about providing Mother with drugs and alcohol during her pregnancy and that the confrontation led to him being shot.

became combative when Officer Brown attempted to use "passive guidance" to get Father back to his cell. Father said to Officer Brown, "[I]f you touch me, I'll beat your ass."

Upon returning to his cell, Father became violent with Officer Rynkowski when he instituted a pat search. Father told Officer Rynkowski, "Don't touch me," and when Officer Rynkowski searched Father, Father turned around and grabbed Officer Rynkowski's throat. Both guards responded, but Father continued to tighten his grip on Officer Rynkowski's throat and refused to let go. Fearing for his life, Officer Rynkowski used "closed-hand fist" hits to Father's wrists to get him to release the grip.[6] The Department's conservatorship caseworker, Fatina Sanders, testified that Father's continued pattern of assaulting others demonstrates a lack of good parenting skills necessary for Dustin's care.

Father testified that he is a member of Puro Tango Blast, which he described as an "organization against family organizations." He stated that unlike other prison gangs, Puro Tango Blast is organized to "stay out of trouble" so that its members could "make parole and go home." He admitted, however, that in entering and remaining in Puro Tango Blast, he had engaged in physical fights while in prison.

---

[6]Father testified that he was provoked during this incident.

8

Father was unable to provide the Department with any suitable placements for Dustin. In his meetings with Sanders, he suggested placing Dustin with his alleged fiancée T.T.; however, the record reflects that the actual nature of Father's relationship with T.T. is in question. T.T. told Sanders that she was not in an intimate relationship with Father and explained that she was "old enough to be his mother."

In any event, placement with T.T. is not suitable because she admittedly "has no clue how to care for a child"; does not have the financial resources to care for Dustin; and, unlike Dustin's current foster parent, has no relationship with him. Additionally, Father could not suggest any placements with his family members because they were "devil worshippers" and "weren't a good fit" to care for Dustin. Sanders testified that Dustin needs a caregiver who can "provide a safe and stable environment that's free from hazards, which include drugs, alcohol, aggressive behavior, [and] criminal activity." The evidence demonstrates that Father is unable to provide the care that Dustin needs now and in the future or to suggest a suitable alternative to act in his stead.

After the Department placed Dustin in foster care, it presented Father with a service plan aimed at achieving reunification.[7] The plan required Father to participate in domestic violence and parenting classes, seek individual counseling, undergo a mental health assessment, submit to regular drug and

_____

[7]The Department created the plan in July 2013, and Father acknowledged its contents that month.

9

alcohol testing, regularly visit Dustin, refrain from engaging in criminal activity, and provide financial stability for Dustin. At trial, Sanders testified that Father had not engaged in any of the required services. She also testified that Father "lacks parenting skills," could not suggest an appropriate placement for Dustin, and continued "to engage in negative behavior" while he was incarcerated despite knowing that Dustin was in the Department's custody and that his actions could affect his ability to retain parental rights.

Because of his incarceration, Father was limited in the services that he could participate in, but the record shows that he failed to participate in most of the services that were available to him. Father reported that he had completed a mental health assessment but failed to provide documentation. He testified that he was diagnosed with anxiety and depression and was taking Zoloft. He also testified that on his medication, he had become more mellow and could "handle [him]self a lot better." Father also said that he would be able to participate in the Batterer's Intervention Program, but there was no documentation showing that he had participated.

Father was unable to participate in other available services because, in part, prison personnel placed him on restriction "a few times" throughout his incarceration. The administration placed Father on restriction because of his

negative behavior toward officers and inmates. In addition to the restriction, guards at the jail requested that Father be placed on "assaultive status."[8]

At the termination trial, Sanders suggested adoption by the foster parent as a permanent plan for Dustin. Dustin is thriving in his current placement, and the record shows that his foster parent "meets all of his basic needs," provides a safe and stable environment for him, shares a special bond with him, and wants to adopt him. Contrastingly, Sanders testified that Father had not told her anything "set in stone" about where he planned to live when released.

Because he was born prematurely, Dustin has health problems that require constant monitoring and attention. He suffers from asthma and gastric reflux, which causes him to spit up when he eats. His foster parent, whose occupation is in the medical field, takes him to the hospital when he has issues with breathing, keeps all necessities—including food and medication—in stock in her home, and shares a special bond with him that is obvious from their interactions. In addition to his medical treatments, Dustin also receives physical and speech therapy services to get him on target developmentally with other children his age. At trial, Sanders suggested that Father could not provide a safe, stable environment for Dustin and that a suitable placement would be with someone who is medically trained or someone who has had long-term contact with Dustin and is able to identify when he has a medical problem that requires attention.

---

[8]The record does not indicate whether Father was placed on assaultive status or what assaultive status entails.

We conclude that this evidence and the remaining evidence presented at trial is legally and factually sufficient to clearly and convincingly support the trial court's judgment because the evidence allowed the trial court to form a firm conviction or belief that termination is in Dustin's best interest. *See* Tex. Fam. Code Ann. § 161.001(2); *J.P.B.*, 180 S.W.3d at 573; *C.H.*, 89 S.W.3d at 28; *see also Holley*, 544 S.W.2d at 371–72. Specifically, we conclude that although the record contains some evidence that a factfinder could have weighed against a decision to terminate,[9] the trial court could have formed a firm conviction or belief that termination is in Dustin's best interest from the evidence of Father's pattern of violent behavior (including violence that endangered Dustin in the womb), his lack of stability and ability to care for Dustin now and in the future, his continued incarceration, and his lengthy criminal history. *See In re M.R.*, 243 S.W.3d 807, 819 (Tex. App.—Fort Worth 2007, no pet.) (concluding that incarceration can be considered as endangering conduct when it affects a parent's ability to provide safe living conditions or to ensure the safety and well-being of the child); *In re S.F.*, 32 S.W.3d 318, 321–22 (Tex. App.—San Antonio 2000, no pet.) (holding

---

[9]For example, Father testified that he had been "put in line" for cognitive intervention and parenting classes. Sanders testified that she did not know whether Father could show positive parenting skills with Dustin, how Father would react to being in the presence of a child, or whether Father would be willing to meet Dustin's medical needs. Father testified that he would be released, at the latest, in August 2014. He also testified that employment at a body shop awaited him upon his release. Finally, Father testified that he had been "falsely accused" of his assault crimes although he had pled guilty to them.

12

that a father's criminal behavior before incarceration and continued misbehavior during incarceration showed a pattern of conduct detrimental to a child).

Additionally, the trial court's decision to terminate could have been guided by the evidence of Father's failure to complete his service plan, the foster parent's bond with Dustin, and the foster parent's ability to properly care for him. *See In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied) (concluding that stability and permanence are important to the growth of a child and affirming a finding that termination was in a child's best interest when the child was thriving in foster care); *Cervantes-Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 255 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (en banc) (concluding that a mother's failures to follow a service plan or to attend appointments arranged by the Department supported a trial court's finding that termination was in the child's best interest); *In re U.P.*, 105 S.W.3d 222, 230–31 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (op. on reh'g) (considering a child's bond with a foster family as a factor supporting the child's best interest in the termination of a father's parental rights).

Because we hold that the evidence is legally and factually sufficient to support the trial court's judgment, we overrule Father's only issue.

**Conclusion**

Having overruled Father's sole issue, we affirm the trial court's order terminating his parental rights to Dustin.

/s/ Terrie Livingston

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL:  LIVINGSTON, C.J.; WALKER and MCCOY, JJ.

DELIVERED:  October 9, 2014