

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-18-00302-CV

_____

IN THE INTEREST OF E.P.-M., A CHILD

---

On Appeal from County Court at Law No. 2
Parker County, Texas
Trial Court No. CIV-17-0143

---

Before Gabriel, Pittman, and Birdwell, JJ.
Memorandum Opinion by Justice Gabriel

# MEMORANDUM OPINION

Appellant L.P. (Mother) appeals the trial court's order terminating the parent-child relationship between her and E.P.-M. (Evan).[1] Before terminating parental rights, a trial court must find by clear and convincing evidence both that the parent has committed at least one of several statutorily-enumerated acts or omissions and that termination is in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001(b). The trial court made both of those findings in its termination order. In this appeal, Mother challenges only the latter finding, arguing in two issues that the evidence is legally and factually insufficient to support a finding that termination of her parental rights is in Evan's best interest. Concluding otherwise, we affirm.

## I. BACKGROUND

### A. FATHER AND MOTHER BEGIN DATING

Father was two credits short of graduating high school when his mother, S.J.-M. (Paternal Grandmother), became extremely ill in December 2015. Father was living in Austin and attending high school at the time, while his father, S.M. (Paternal Grandfather), and Paternal Grandmother were living in Weatherford. Paternal Grandfather also had serious medical conditions, including Alzheimer's, so when

---

[1]Throughout this opinion, we use aliases to refer to the child and his family members. *See* Tex. R. App. P. 9.8(b)(2). Additionally, we note that the trial court also terminated the parental rights of Evan's biological father, C.J.-M (Father). Father filed a notice of appeal, and we previously dismissed his appeal for want of prosecution. *In re E.P.-M.*, No. 02-18-00302-CV, 2018 WL 6241521, at *1 (Tex. App.—Fort Worth Nov. 29, 2018, no pet.) (mem. op.).

Paternal Grandmother took ill in December 2015, Father dropped out of high school and went to live with his parents in Weatherford to help take care of his ailing mother.

In February 2016, while he was still living with his parents in Weatherford, Father sent a Facebook message to Mother, who was at that time just a few credits away from finishing high school. Prior to that, Father and Mother had only been casual high school acquaintances, but Father's Facebook message turned into a conversation, and as Father and Mother got to know each other, they decided to start dating. Father traveled back and forth between Weatherford and Austin to see Mother, who lived with her father, L.P. (Maternal Grandfather). By April 2016, Father had begun working at a Family Dollar in Austin and living with Mother at Maternal Grandfather's house, though he still traveled back to Weatherford off and on as needed to care for his parents. Sometime before October 2016, and while he was in Austin, Father received word that Paternal Grandmother had passed away.

## B. EVAN'S PREMATURE BIRTH AND NICU STAY

It was not long after Mother and Father began dating that Mother became pregnant with Evan. His due date was January 10, 2017, but on November 1, 2016, just days after her eighteenth birthday, Mother went into preterm labor. Evan was born the next day, arriving approximately ten weeks early and weighing a mere three pounds, seven ounces. He was admitted into the neonatal intensive care unit (NICU) of the St. David's Medical Center in Austin.

Evan remained in the NICU for about seven weeks. Mother dropped out of high school to be with Evan, and she stayed at the hospital while he was in the NICU, even to the point of sleeping and showering at the hospital throughout the entirety of his stay. By the time Evan was born, Father had left his job at Family Dollar, but he started working for UPS sometime in early November. And while Evan was in the NICU, whenever Father was off work, he would stay at the hospital until it was time for him to go back to work. With the passage of time and the care he received in the NICU, Evan continued developing and was healthy. While Evan was in the NICU, hospital personnel taught Mother and Father how to care for him, which included teaching them how to feed him and how to recognize when he needed to be fed.

Toward the end of Evan's stay in the NICU, Mother and Father were able to feed formula to him. And by the time he was discharged on December 20, 2016, Evan's weight had increased to approximately six pounds. When Evan was discharged, the hospital instructed Mother and Father to feed him three to four ounces of formula every three to four hours until instructed otherwise. They were also instructed to take Evan to a pediatrician for a well-child assessment.

### C. EVAN'S FIRST WELL-CHECK

The next day, December 21, 2016, Mother and Father took Evan to see Dr. Kymberly Colman, a pediatrician in Austin. After seeing Evan, Dr. Colman had no concerns and instructed Mother and Father to continue following the discharge instructions the hospital had given them.

4

Dr. Colman told Mother and Father that Evan would need a follow-up visit and also asked them whether they wanted her to serve as Evan's primary care physician. But at that time, Mother and Father chose not to select Dr. Colman as Evan's primary care physician, and they did not schedule Evan for a follow-up visit with Dr. Colman because they did not know whether they would continue living in Austin.

## D. FATHER, MOTHER, AND EVAN MOVE TO WEATHERFORD

By January 3, 2017, Mother and Father, with Evan in tow, had relocated to Weatherford, moving in with Paternal Grandfather. When they moved to Weatherford, neither Father nor Mother had a job in the area. On January 3, 2017, Mother and Father took Evan to see Dr. Danica Jordan, a Weatherford pediatrician. Dr. Jordan's records reflect this visit was for a "well baby exam and to establish care." Evan weighed five pounds, fourteen ounces at this visit. During the visit, Mother and Father reported that Evan had been constipated. Though Dr. Jordan's records show that she had recommended Mother and Father give no more than one ounce of pear juice to Evan daily for his constipation, Mother and Father both testified that Dr. Jordan had told them to give him pure concentrate apple juice.

Dr. Jordan also recommended they return the next week for another weight check for Evan. But according to Father's and Mother's testimony, they did not agree with Dr. Jordan's alleged advice to provide Evan with pure concentrate apple juice because they thought doing so could harm Evan, so they did not follow up with Dr.

5

Jordan the next week. Instead, they decided to look for another Weatherford pediatrician.

After several weeks passed and Mother and Father did not find another pediatrician, they took him back to see Dr. Jordan on January 31, 2017, for a weight check. Evan had gained only six ounces in the twenty-eight days since his previous visit and weighed six pounds, four ounces. Dr. Jordan referred Mother and Father for early childhood intervention services (ECI), which, according to Mother's and Father's testimony, were in-home services designed to help them learn how to better care for Evan and help him reach his developmental milestones. Their first ECI visit was scheduled for February 16, 2017.

### E. FATHER AND MOTHER RUN OUT OF FORMULA

About a week before their first visit from ECI, Mother and Father traveled back to Austin to celebrate Maternal Grandfather's birthday. They did not have a car or money to travel at that time, so Father's grandmother, K.V. (Paternal Great Grandmother) drove Mother, Father, and Evan to Austin. While on the way to Austin, Mother and Father noticed Evan had a rash, so they scheduled an appointment with Dr. Colman, the pediatrician who had seen Evan the day after his discharge from the NICU. The first night they were in Austin during this birthday trip, Mother, Father, and Evan stayed in a hotel room with Paternal Great Grandmother. The next morning, Paternal Great Grandmother dropped all of them off at Dr. Colman's office, and then she left.

After Evan's appointment with Dr. Colman, it was time for Evan to eat. But Mother and Father had run out of formula to feed him. And they did not have enough money to buy him any more formula; they had traveled to Austin hoping that Maternal Grandfather would help them buy more formula when they arrived. Mother and Father had not been able to see Maternal Grandfather by the time Evan needed to eat, so Mother and Father took Evan, got on a bus, and went to a grocery store. And because they could not afford Evan's formula, Mother and Father purchased a can of PET evaporated milk and fed it to Evan. Once they eventually made it to Maternal Grandfather's house, Maternal Grandfather drove them to the store and helped them purchase Evan's formula.

Mother, Father, and Evan were back at Paternal Grandfather's house in Weatherford for their February 16 ECI visit. During the visit, Mother and Father told the ECI worker, Abbie Martinez, that they were a little worried that Evan appeared so small. Martinez made an appointment for a dietitian to come see Evan. Mother testified that if Martinez had not come out for the ECI visit and made the dietitian appointment, Mother probably would not have gotten a dietitian for Evan on her own.

## F. EVAN'S EMERGENCY REMOVAL

On February 21, 2017, the Texas Department of Family and Protective Services (the Department) received a referral stating a concern that Evan was malnourished and that Mother and Father did not seem to have a bond with him. On

7

February 23, 2017, Misty Enos, an investigator with the Department, visited Mother and Father. When Investigator Enos saw Evan, she was greatly concerned for him from just seeing his physical appearance. She could see Evan's cheekbones, and she noticed that there was little to no fat on his body. In addition, when she held Evan, he was almost limp, he was not very responsive, and he had a vacant stare. After speaking with her supervisor, Investigator Enos informed Mother and Father that Evan needed to be seen immediately at Cook Children's hospital. While Mother and Father told Investigator Enos that they had been following the instructions from the NICU and the other doctors who had seen Evan, they ultimately agreed to Investigator Enos's request to take Evan to the hospital. Mother and Father drove Evan to the Cook Children's emergency room, and Investigator Enos followed.

Dr. Carey Cribbs, a staff physician in the Cook Children's emergency department, treated Evan upon his arrival. When Dr. Cribbs first saw Evan, she noticed he was "extremely, extremely thin." Evan's physical appearance so concerned Dr. Cribbs that she was "pretty sure" she would admit him just based upon how he looked. His ribs were protruding; he did not really have buttocks but rather had skin and skinfolds; and his face was really thin. Dr. Cribbs stated that anybody who looked at Evan would have been surprised at how thin he was.

In explaining the need to admit Evan, Dr. Cribbs testified that a baby at Evan's stage of development usually gains about an ounce per day but that Evan's history showed he had only gained about six ounces in twenty-eight days. Because Evan was

not gaining adequate weight for his stage of development, Dr. Cribbs diagnosed him with failure to thrive and admitted him so that the medical personnel could ensure he was properly fed and determine the cause of his inadequate weight gain.

Evan was in the hospital for four days. During that time, tests revealed no medical reason why he had been malnourished. And while he was in the hospital under the care of medical professionals, Evan had no trouble eating and gained more than one-and-a-quarter pounds. Investigator Enos testified that in light of the fact that medical testing did not reveal a cause for Evan's failure to thrive and the fact that he had gained weight and showed signs of improvement while in the hospital, doctors had informed the Department that Evan's malnourishment did not happen "for any other reason but neglect." So on February 24, 2017, the Department filed a petition initiating this suit. In its petition, the Department alleged there was an immediate danger to Evan's physical health or safety and requested an emergency order authorizing it to take emergency possession of Evan. The same day, the trial court granted the Department's request for emergency removal and set an adversary hearing.

On February 27, 2017, while Evan was still in the hospital, Donna Wright, a pediatric nurse practitioner assigned to Cook Children's Child Advocacy Resource and Evaluation (CARE) team, was asked to perform a consult to determine whether

9

the cause of Evan's failure to thrive was due to his not being adequately fed.[2]  After reviewing Evan's case, Nurse Wright concluded that his failure to thrive did not result from any medical cause but rather was due to his not being fed the appropriate amount of food.  At trial, after reviewing photographs of Evan's appearance on the day he was admitted, Nurse Wright testified that Mother and Father should have known something was wrong, stating that "a parent, a bystander, anyone that saw [Evan] undressed in that state, would know that there was something that wasn't okay with" him.

## G.  MOTHER'S SERVICE PLAN

On May 15, 2017, about three months after the Department took emergency possession of Evan, the Department filed a family service plan, which Mother had signed.  The plan stated that the Department had become involved because it was concerned that Mother did not understand the severity of the allegations that had placed Evan at risk of harm, would not recognize signs of neglect, would not be protective of Evan, and did not have a complete understanding of Evan's needs.  The Department's ultimate goal was to reunite Evan with Mother and Father.  To achieve that end, Mother was to successfully complete several tasks and services, including the following:  she was to accept responsibility for the reasons why Evan came into the

---

[2]Nurse Wright testified that the CARE team consults in cases involving children "that may have been a victim of some type of child abuse[—]physical abuse, sexual abuse, neglect, failure to thrive, Munchausen Syndrome, those sorts of things."

Department's care; she was to obtain employment that could independently support herself and Evan; she was to obtain stable housing for Evan; and she was to successfully complete individual counseling.

On May 24, 2017, Mother had her first counseling visit with Kristen McNeill, a family therapist in the Dallas-Fort Worth metroplex. The goals established for Mother's counseling included maintaining stability and addressing the Department's concerns. Mother saw McNeill a total of eleven times through August 2017, at which point Mother discontinued her counseling with McNeill because Mother and Father had decided to move to Killeen. Mother testified that although she knew that her case had about a one-year timeline, that her move would necessitate that she start over from the beginning with her counseling, and that her decision to move could affect whether she was reunited with Evan, she chose to move to Killeen anyway.

Although McNeill believed Mother had made some progress in her counseling, she was still concerned with Mother's achieving stability, among other things. In fact, two months into counseling Mother, McNeill still had concerns that Mother had not made much progress in achieving stable employment. McNeill believed Mother needed to continue counseling, and she recommended Mother do so in her new city. Thus, McNeill did not discharge Mother as having successfully completed her counseling.

## H. Father, Mother, and Evan Move Away From Weatherford

In August 2017, the Department placed Evan with Mother's brother and sister-in-law, who lived in Austin. To be closer to Evan, Mother and Father moved to an apartment in Killeen in July 2017. Mother testified that in September 2017, she began working at a McDonald's in Austin, which was about sixty-five miles away from Killeen. That was the first job she got after the Department had removed Evan in February 2017. In January 2018, after having worked at the McDonald's in Austin for about three months, Mother transferred to a McDonald's in Killeen but quit that job shortly after. In February 2018, Mother started working at a Subway in Austin.

Also in early 2018, the rent increased at the apartment where Mother and Father had been living, so they moved to a different apartment in Killeen, leasing it through April 2018. The apartment's property manager, Kyle Kilpatrick, testified that Father represented he was leasing the apartment for his father, who was in the hospital, and did not list Mother as an occupant of the dwelling. Kilpatrick explained that the February rent for the apartment was initially paid electronically but that the transaction was later reversed for insufficient funds. Kilpatrick further stated that he never received any rent payments for the months of February, March, or April, which led him to post an eviction notice. But Kilpatrick ultimately did not need to evict Mother and Father because they voluntarily moved out.

While living in Killeen, Mother and Father restarted counseling in December 2017 with Nicole Wallace. Wallace set Mother's and Father's counseling goal as

"protective parenting," which she explained meant addressing the Department's concerns when it came to parenting, including helping them to understand why the Department became involved, how they contributed, and how they could keep it from happening again. Wallace had seen Mother and Father jointly five times from December 2017 to the beginning of April 2018 when the Department requested that Mother and Father undergo individual counseling instead of couples counseling. Wallace continued as Mother's counselor, and she referred Father to a different counselor.

Mother and Father had their first individual counseling session scheduled for mid-April 2018, but they cancelled the appointment and never rescheduled. That is because they had moved back to Weatherford without telling anyone. Mother testified that she could have stayed in Killeen and completed her individual counseling with Wallace but she chose not to do so. Wallace testified that Mother and Father had not successfully met their counseling goals, and she did not successfully discharge them; rather, she discharged them because of their inconsistent appointments and because they had moved.

## I. FATHER, MOTHER, AND EVAN MOVE BACK TO WEATHERFORD

In September 2017, problems developed and Mother's brother and sister-in-law expressed concern about supervising the visits of Mother and Father with Evan in their home. The Department caseworker began working on changing the visitation site. On September 8, the caseworker was notified that the Department received a

physical abuse report alleging that when Mother and Father visited Evan the night before at the home of the relative placement, the reporter observed Mother's brother and sister-in-law tossing Evan's clothes outside on the lawn. The report further alleged that the reporter saw either Mother's brother or sister-in-law throw Evan across the yard, breaking his clavicle. Since it was reported that the child was at Dell's Children's Hospital, a Department worker called the hospital to learn that Evan was not a patient. The caseworker went to Mother's brother and sister-in-law's residence and found no clothes on the front lawn and Evan at home, appearing healthy and happy.[3]

Even though the Department ruled out the allegations of physical abuse, Mother's brother and sister-in-law informed the Department they could no longer serve as a placement for Evan. A non-family member placement was found for Evan in Weatherford and the child was moved back.

Mother and Father moved back to Paternal Grandfather's home in Weatherford sometime in May 2018. Mother testified that upon moving back to Weatherford, she got a job at Film Alley and had been employed there full-time for about three months as of the date of her trial testimony on August 22, 2018.

Mother also restarted her individual counseling, seeing a third therapist, Courtney Landes. As of the time of trial, Mother had seen Landes eleven times.

---

[3]Mother denied making the report to the Department.

Landes testified that she believed Mother had made some progress on her counseling goals but that she was not prepared to discharge Mother because there was still more that Mother needed to work on. Landes also stated that Mother had not demonstrated long-term stability in either her residence or her employment.

## II. APPLICABLE LAW AND STANDARD OF REVIEW

In two issues, Mother challenges the trial court's best-interest finding, arguing it is not supported by legally or factually sufficient evidence.

In deciding whether legally sufficient evidence supports the trial court's best-interest finding, we look at all the evidence in the light most favorable to that finding to determine whether a reasonable factfinder could form a firm belief or conviction that termination is in the child's best interest. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

To decide whether factually sufficient evidence supports the trial court's best-interest finding, we perform "an exacting review of the entire record." *In re A.B.*,

437 S.W.3d 498, 500 (Tex. 2014). In doing so, we give due deference to the finding and do not supplant it with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that termination of parental rights is in the child's best interest. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *Id.* at 18–19.

In reviewing the evidentiary sufficiency of a best-interest finding, we employ a strong presumption that keeping a child with a parent serves the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). We also consider the evidence in light of nonexclusive factors that the trier of fact may apply in determining the child's best interest: (1) the child's desires; (2) the child's emotional and physical needs, now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the child's best interest; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions indicating that the existing parent–child relationship is not a proper one; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013) (stating that in reviewing a best-interest

16

finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted));

*In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012).

These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## III. DISCUSSION

Our review of the entire record leads us to conclude that legally and factually sufficient evidence supports the trial court's best-interest finding.

### A. EVAN'S PHYSICAL NEEDS, AND THE PHYSICAL DANGER TO EVAN, NOW AND IN THE FUTURE

Nourishment is a basic physical need for a child, and thus the failure to adequately feed a child presents a physical danger to him. A child may become malnourished for many reasons, including because his parents simply lack the knowledge and understanding to know how much food he needs to be healthy, to recognize the signs that he needs to be fed, or to perceive from his frail physical appearance that he is malnourished to the point of needing medical attention. That is what happened in this case.

This case began because Mother and Father failed to adequately feed Evan, leading him to become seriously and obviously malnourished. Nurse Wright testified

17

that Evan did not get that way overnight. Rather, according to her, he would have exhibited numerous signs and signals that Mother and Father should have recognized meant he was hungry, and at the very least, on February 23, 2017, they certainly should have perceived from his appearance alone that something was wrong.

But Mother and Father neither recognized the signs and signals that Evan was hungry nor perceived that anything was wrong with him on February 23, 2017. To the contrary, before taking Evan to the Cook Children's emergency room, Mother told Investigator Enos that she and Father had been following the instructions for feeding Evan that the NICU and other doctors had provided to them. And Father denied that anything was wrong with Evan, telling Investigator Enos that Evan was "very muscular" and "very strong." Mother's and Father's inability to recognize the cues that Evan was hungry and malnourished put Evan's physical well-being at risk, and according to Perla Quezada, the primary caseworker assigned to this case, that lack of awareness was one of the Department's concerns about Mother and Father at the beginning of this case.

So in seeking to reunify Evan with his parents, one of the requirements in Mother's service plan was for her to accept responsibility for the reasons Evan had come into the Department's care. Quezada testified that this requirement was important because if Mother did not come to a place of accepting responsibility, the Department was concerned that she would be unable to be protective of Evan in the future. Part of helping Mother reach a point of accepting responsibility was the

requirement that she undergo individual counseling. As stated by all three of Mother's counselors, one of the objectives of her counseling was addressing the Department's parenting concerns. And Mother's second counselor testified that particular objective included helping Mother understand why the Department had removed Evan, how she had contributed to the need for it to do so, and what she could do to ensure it did not happen again.

From the evidence presented at trial, the trial court could have reasonably concluded that even after eighteen months of assistance and services from the Department, Mother did not accept responsibility for Evan's malnourishment and was still unable to understand his nourishment needs or recognize the cues suggesting he needed food. While there was evidence that Mother had indicated to her counselors that she accepted responsibility for Evan's removal, Mother was never successfully discharged from counseling. In addition, Quezada—who, unlike any of Mother's counselors, had interacted with Mother during the entirety of this case— testified that Mother had not accepted responsibility to the Department's satisfaction. And one of the reasons why was Mother's own trial testimony.

During trial on August 22, 2018, Mother was presented with photographs of the way Evan looked eighteen months earlier on February 23, 2017. She was also shown photographs of the way Evan looked at an earlier time when he appeared healthy and not malnourished. When asked to compare the two photographs, Mother stated that she "[did not] see much of a difference." Mother also testified that seeing

19

the pictures of how Evan looked on February 23, 2017, caused her "[a] little" concern. She also added that with the benefit of her parenting classes and her counseling, she could see from looking at the February 23, 2017 photographs there "may have been a problem."

In explaining why she did not believe Mother had accepted responsibility for the Department's involvement, Quezada based her conclusion in part on this testimony. Quezada stated that she was particularly troubled that after eighteen months of services and the Department's involvement, Mother still was not "great[ly] concern[ed]" when looking back at how Evan looked on February 23, 2017. Quezada said that Mother's failure to express "great concern" at how Evan looked on February 23, 2017, was distressing "because medical professionals have been up here saying that anybody, any bystander, would have been very concerned just by looking at [Evan] at that time." And Patrick McCarty, the attorney ad litem, expressed a similar conclusion, stating that he had not seen sufficient growth in Mother or Father to allow him to conclude either that they could provide for Evan's physical needs or that Evan would not face the same physical danger that led to his hospitalization on February 23, 2017.

In light of the foregoing, the trial court could have reasonably concluded that the very same concerns that led to Evan's extreme malnourishment and need for emergency removal—Mother's inability to recognize the cues that Evan was hungry and malnourished—still existed at the time of trial eighteen months later despite the

20

Department's involvement and the services Mother participated in. And given those concerns, the trial court could also have reasonably concluded that returning Evan to Mother's care would subject him to the very same risk to his physical person that led to his removal in the first place. Accordingly, we conclude these factors weigh in favor of the trial court's best-interest finding.

## B. PARENTING ABILITIES, STABILITY OF THE HOME, AND PLANS FOR EVAN

Another big concern of the Department following Evan's removal was the instability that was evident in Mother's and Father's lives. So part of Mother's service plan required her to demonstrate the ability to maintain stable employment and housing.

We have already outlined in the background of this case the evidence of Mother's instability in both employment and housing and thus need not detail that evidence again here. To summarize, the record shows that during the eighteen months that this case was pending, Mother moved residences four times between two cities. The record shows that she made at least two of those moves because she and Father lacked sufficient finances to afford their existing residences. The record also shows that Mother changed jobs four times over the course of this case, with none of those jobs lasting more than three months. Mother herself admitted this demonstrated instability.

The Department caseworker also testified that Mother never demonstrated stability in housing or employment, and that was another reason she did not believe

Mother had demonstrated the ability to parent Evan. Quezada specifically noted that Mother had indicated that her and Father's instability before Evan was removed had caused them not to pay adequate attention to him and, consequently, was part of the reason he ended up malnourished. Quezada testified that given Mother's acknowledgement about the role her instability played in necessitating Evan's removal, her continued pattern of instability during the eighteen months after could, as it had when this case started, make her unable to adequately pay attention to Evan's needs going forward. Attorney ad litem McCarty agreed with Quezada, telling the trial court that over the course of this case, Mother and Father had not shown that they had established stability or that their parental abilities had improved significantly.

As for Evan, from September 2017, he had been placed with a foster family. And by December 2017, the Department had changed its permanency goal from family reunification to "Relative/Fictive Kin, Adoption." The record shows that Evan had assimilated into his foster home and was thriving. Before Evan arrived, the home was composed of Foster Father, Foster Mother, and their four other children. Foster Father had a full-time job working at a university, while Foster Mother stayed at home and cared for their children. After Evan arrived, the foster family treated him like their family; over time, the foster parents had grown to view him as a son, and the foster siblings grew to see him as their brother.

Foster Mother took Evan to his doctor's appointments. When he first came into the home, he still had residual effects from his malnourishment, including that he

22

would not feel full after eating. Foster Mother was in close contact with Evan's pediatrician. To properly care for him, Foster Mother needed to pick up on his cues, and she testified that she was able to do so. She stated that in the couple of months prior to trial, Evan had improved to the point of being able to decline eating something he did not like and of feeling comfortable that he would be provided food.

The record reflects the foster parents had adequate housing and adequate income to support Evan. They were able and willing to provide a safe and stable home for him and provide for his needs. And they desired to adopt him. Quezada testified that the foster family had adequately met Evan's needs while he had been placed there and that he had been welcomed into their home as a family member. She stated that Evan was doing very well in their home, that he was bonded to the foster family, and that he recognized the foster family as his family. Ad litem attorney McCarty told the trial court that Evan was physically healthy and was bonded with his foster family, that he was happy and safe there, and that he had stability. Both Quezada and ad litem attorney McCarty stated that termination of Mother's parental rights was in Evan's best interest.

Given the foregoing, the trial court have reasonably concluded that Mother's parenting skills had not improved from the time Evan was removed and that her continued instability meant that she could not provide a stable home for Evan. And the trial court could also have reasonably concluded that Evan had found a stable home in his foster family—a home that could provide for his physical needs and

23

could provide the stability he needed to thrive. Accordingly, we conclude these factors also weigh in favor of the trial court's best-interest finding.

## IV. CONCLUSION

In sum, after considering the *Holley* factors under the applicable sufficiency standards of review, we conclude that the clear and convincing evidence before the trial court was legally and factually sufficient to support its conclusion that termination of Mother's parental rights was in Evan's best interest. Accordingly, we overrule Mother's issues and affirm the trial court's order of termination. *See* Tex. R. App. P. 43.2(a).

/s/ Lee Gabriel

Lee Gabriel
Justice

Delivered: February 14, 2019