# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-19-00851-CV

### K. B., Appellant

### v.

### Texas Department of Family and Protective Services, Appellee

---

**FROM THE COUNTY COURT AT LAW NO. 1 OF WILLIAMSON COUNTY**
**NO. 18-0120-CPSC1, THE HONORABLE BRANDY HALLFORD, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

K.B. (the father) appeals from the trial court's order, following a jury trial, terminating his parental rights to R.B. and O.B. (the children), who were four and three years old at the time of trial. In a single issue on appeal, the father asserts that the evidence is legally and factually insufficient to support the jury's finding that termination of his parental rights is in the best interest of the children. We will affirm the trial court's order.

## BACKGROUND

The Texas Department of Family and Protective Services (the Department) filed suit to terminate the parental rights of the mother and the father of the children. The suit was based on allegations that the mother had used methamphetamines and that the father had exposed the children to domestic violence and physical abuse. The suit proceeded to a jury trial regarding

termination of the father's parental rights.[1]  The statutory grounds for termination that were submitted to the jury were that the father had: (1) engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional well-being of the children; (2) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the physical or emotional well-being of the children; (3) failed to comply with the provisions of a court order that specifically established the actions necessary for the father to obtain the return of the children; and (4) used a controlled substance in a manner that endangered the health or safety of the children.  *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O), (P).  The jury found that the father had committed at least one of the alleged grounds for termination and that termination of his parental rights was in the best interest of the children.  *See id.* § 161.001(b)(2).  Consistent with the jury's verdict, the trial court rendered judgment terminating the father's parental rights.  This appeal followed.

## STANDARD OF REVIEW

A trial court may order termination of the parent-child relationship "if clear and convincing evidence supports that a parent engaged in one or more of the [statutorily] enumerated grounds for termination and that termination is in the best interest of the child." *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam) (citing Tex. Fam. Code § 161.001(b)). "Proceedings to terminate the parent-child relationship implicate rights of constitutional magnitude that qualify for heightened judicial protection." *In re A.C.*, 560 S.W.3d 624, 626 (Tex. 2018). "Because termination of parental rights 'is complete, final, irrevocable and divests for all time' the natural and legal rights between parent and child, a court cannot involuntarily

---

[1] Before trial, the mother filed an affidavit of voluntary relinquishment of her parental rights to the children and is not a party to this appeal.

2

sever that relationship absent evidence sufficient to 'produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *Id*. at 630 (quoting Tex. Fam. Code § 101.007; *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985)).

"The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *Id*. "Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true." *Id*. at 631. "Factual sufficiency, in comparison, requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *Id*. "In a factual-sufficiency review, the appellate court must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *Id*. "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id*.

**ANALYSIS**

On appeal, the father does not challenge the sufficiency of the evidence supporting the jury's finding that he had committed at least one of the alleged statutory grounds for termination. Instead, the father argues that the evidence is legally and factually insufficient to support the jury's finding that termination was in the best interest of the children.

The best-interest prong of the termination statute "is child-centered and focuses on the child's well-being, safety, and development." *Id*. When deciding the best-interest issue, we consider the well-established *Holley v. Adams* factors, which include the child's wishes, the

3

child's emotional and physical needs now and in the future, emotional or physical danger to the child now and in the future, the parenting abilities of the parties seeking custody, programs available to help those parties, plans for the child by the parties seeking custody, the stability of the proposed placement, the parent's conduct indicating that the parent-child relationship is improper, and any excuses for the parent's conduct. 544 S.W.2d 367, 371-72 (Tex. 1976); *see A.C.*, 560 S.W.3d at 631; *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012); *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). The Department need not prove all the *Holley* factors as a "condition precedent" to termination, and the absence of some factors does not bar the factfinder from finding by clear and convincing evidence that termination is in a child's best interest. *C.H.*, 89 S.W.3d at 27; *Spurck v. Texas Dep't of Family & Protective Servs.*, 396 S.W.3d 205, 222 (Tex. App.—Austin 2013, no pet.). Moreover, a parent's statutorily offensive conduct is often intertwined with the best-interest determination, and the same evidence may be probative of both issues. *See A.C.*, 560 S.W.3d at 631–32; *C.H.*, 89 S.W.3d at 28; *Horvatich v. Texas Dep't of Protective & Regulatory Servs.*, 78 S.W.3d 594, 601 (Tex. App.—Austin 2002, no pet.).

**The father's conduct**

The case began in July 2018 when Child Protective Services (CPS) received a report alleging that one of the children had been abused while in the father's care. Keela Hattley, a teacher at the children's daycare, discovered a bruise on the younger child when she was changing her diaper. Hattley testified that the bruise was black and blue and covered the child "from her back to her butt cheek." When Hattley asked the child what had happened, the child told her, "Sugar beat my ass." "Sugar" was the nickname of the father's girlfriend (the girlfriend), who lived with the father at the time. Hattley could tell that the bruise was causing

4

the child pain, and the severity of the bruising made Hattley cry. She had never seen such a large bruise on a young child. Hattley showed the bruise to a coworker, who also cried upon seeing it. Hattley then called CPS and reported what she believed to be child abuse.

Tee Holder, an investigator for the Department, responded to the report and went to the home of the children's paternal grandparents (the grandparents), who were watching the children at the time. Holder testified that when she examined the child, she saw "bruising on the buttock area and the lower back area" of the child that was "pretty severe." When Holder asked the grandmother what had happened to the child, the grandmother "pretty much just blew it off" and "made it seem like it wasn't as big a deal as it was." The father showed up at the home shortly thereafter and "seemed confused" as to why CPS was there. Holder noticed that the father's "concern for the bruising just wasn't there." Holder called her supervisor, who then authorized an emergency removal of the children.

During her investigation, Holder learned that the father and the mother had an ongoing history with the Department. The parents were involved in an open Family Based Safety Services (FBSS) case resulting from allegations that the father was not feeding the children properly and not changing their diapers.[2] Both parents also had a history of drug use.

Erin Weaver, a Department conservatorship worker, was assigned to the case. Weaver testified that she interviewed the mother first. During the interview, Weaver showed the mother a photograph that displayed the severity of the younger child's bruise, causing the mother to "burst into tears." The mother told Weaver that "she felt betrayed" by the father because he

---

[2] Holder explained that an FBSS case is one in which there is no court involvement and the parents participate voluntarily in certain services, such as parenting classes or drug and alcohol treatment, "so that way they can get back into a position where the Department doesn't have to be involved."

5

had told her that the bruise was from an accidental fall, but "when she saw the bruise she told me that she knew that that couldn't have been what happened and that someone did it."

When Weaver met with the father, the father expressed frustration with the situation because "he felt he had already done" services during the voluntary FBSS case and said that this time, "he wasn't going to play the game." Moreover, the father believed that he had done nothing wrong.

Weaver created service plans for the parents. The father's service plan included requirements that he maintain stable housing, not consort with individuals who engage in criminal activity, cooperate and communicate with the Department, participate in individual counseling, protective parenting and any required drug addiction classes, have visitation with the children, submit to random drug screens, submit to a drug and alcohol assessment through Outreach Screening Assessment and Referral (OSAR), complete a psychological evaluation, and maintain employment. Weaver testified that she believed the most important requirement for the father was sobriety. In his earlier FBSS case, the father had performed a drug and alcohol assessment, and the Department's recommended program based on that assessment was Marijuana Anonymous.

The father completed some but not all services. The services that the father completed included protective parenting classes, a psychological evaluation, and communicating with the Department. The services that the father failed to complete included Marijuana Anonymous, individual counseling on a weekly basis (Weaver testified that the father attended 12 out of 27 sessions), and maintaining employment. The father tested positive for marijuana several times, both during the FBSS case and the CPS case. During the CPS case, the father tested positive on six out of seven tests, and "no showed" for 28 tests, which the Department

6

considered to be positive tests. According to Weaver, the father was adamant that he would not stop using marijuana because he claimed that he needed it for pain management.

The father also missed 19 out of 67 possible visits with the children. The father provided explanations for some of the missed visits, including conflicts with his job, but did not provide explanations for others. The missed visits indicated to Weaver that the children "aren't [the father's] priority." Weaver also testified that during some of the visits that the father attended, he would express frustration with the children's behavior, fail to fully engage with the children, or refuse to change the children's diapers when they needed to be changed.

The father, who was 30 years old at the time of trial, testified that he had a history of using drugs and alcohol. He began drinking when he was 16 or 17 years old, started smoking marijuana at age 18, and progressed to cocaine and methamphetamines by the time he turned 21 or 22. He claimed that by age 24 or 25, he was "completely sober," with the exception of regular marijuana use and occasional drinking. However, the father relapsed into methamphetamine use in December 2016.

The father had a criminal history. He testified that he was arrested in 2008 or 2009 for possession of a prohibited weapon, specifically a butterfly knife. He was arrested in 2011 for driving while intoxicated, although that charge was reduced to reckless driving, and again in 2015 for possession of marijuana. In 2016, the father was charged with deadly conduct, arising from an incident involving the discharge of a firearm from a vehicle occupied by the father and his friend. The bullet from that firearm had hit a house. The deadly-conduct charge was dismissed when it could not be determined if the father or his friend had discharged the firearm.

Additionally, the father was arrested in June 2017, during the FBSS case, for driving while intoxicated, when he and that same friend from the 2016 incident were found inside a vehicle after a rollover automobile accident. The officer who investigated the crash testified that the father had a strong odor of alcohol emanating from his person and a blood-alcohol level of .159, almost twice the legal limit. However, the father claimed that his friend had been driving the vehicle, and the charge was dismissed.

The father met the mother in 2012, when he was 22 and she was 17. They lived together from 2012 to 2017, in a duplex the grandparents owned. The father testified that he had an agreement with the grandparents to pay rent "when he could." The father's relationship with the mother was volatile. He explained, "We fought. We argued. She would scream. The woman has hit me over the head with a dog bowl and everything else. It was not a good situation for me to be in." He added that the mother had occasionally thrown things at him and had broken his teeth and nose. The father testified that during a couple of their arguments, law enforcement was called out to respond. While they lived together, the mother used methamphetamines regularly, and the father testified that this contributed to her anger and violence. The father admitted that he was sometimes violent with the mother, but he claimed that this was "always reactionary" in response to the mother's violence against him.

In 2017, the father and the mother ended their relationship and the father became the primary caretaker of the children. However, on some weekends, the father allowed the mother to take the children to the mother's hometown of Gonzalez, even though the mother was not allowed unsupervised access to the children due to her ongoing drug use. The father acknowledged that this was a "risky" decision.

After ending his relationship with the mother and having several brief relationships with other women, the father began a relationship with the girlfriend. When the girlfriend moved in with the father, the girlfriend became the primary caretaker of the children. The father claimed that there was no domestic violence between him and the girlfriend.

The father testified that he did not know the cause of the younger child's bruise, but he claimed that "there were three instances over a period of . . . two days where she fell, was in some type of situation where she got hurt," and he thought that one of those incidents might have caused the bruise.[3] The father testified that he was concerned when he first saw the bruise, but after he examined it closely, the bruise did not appear severe to him. The father denied that he had caused the bruise to the child and did not believe that the girlfriend had caused the bruise. He explained, "She didn't use corporal punishment with her children. I didn't have any concerns or worries with her hitting one of mine." However, the father acknowledged later in his testimony that the girlfriend had spanked his older child once.

The mother testified that she and the father, while living together, sometimes had "disagreements" that "would escalate into an argument or yelling" and occasionally "got physical . . . for both parties." She explained, "There [were] a few times that I would get frustrated and I would lunge at him. . . . There were a few times that I would get frustrated. He would walk out the back door and I threw a little, a small pot at the back door, bounce off and fall on the floor. Things like that." When asked if the father ever touched her "violently," the mother testified, "Yes. And generally in reaction to a violent action from me or a violent—just a violent situation or not necessarily violent but just angry and frustrated and feeling like we

---

[3] According to the father, these possible incidents were a fall resulting from a dog running into the child, a fall in the bathtub, and a fall from a crib.

couldn't communicate with the other." The mother recounted one incident in which the father had been drinking, she threatened to leave him, and "things got a little out of control." She explained, "[We] yelled. We fought. He chased me around the backyard of where we were. I ran—there was a point that in his desperation to get me to just stop and listen and realize that he was really, really hurting, he irrationally . . . tried to hurt himself" by "holding a knife to his throat." She added, "He would grab my arms or grab me by the arm and I would pull away. I remember hiding behind a shed just to try and just not—just try to remove my physical being from the situation. And we just chased each other around." To stop him, the mother ended up hitting the father with a baseball bat. The mother admitted that during many of her fights with the father, the children were present at the duplex. However, she believed that they were usually in another room, and "there were very few times that we actually yelled and screamed at each other in front of—in front of the girls."

The mother testified that she did not believe the father would harm the children and "did not know" if the girlfriend had caused the younger child's bruise. However, she acknowledged that the amount of bruising was "excessive in comparison to the story" the father had told her regarding an accidental fall.

**The stability of the father's home and his parenting abilities**

The father testified that he was bonded with his children and loved spending time with them. The father raised the children on his own for several months between the end of his relationship with the mother and the beginning of his relationship with the girlfriend, although he added that there were other women who would "stay the night" with him during that time. The father continued to reside in the same duplex in which he had been living for several years,

although he was planning to move into a house that he was purchasing (with the grandparents as co-signers on the loan).

The grandfather testified that his son was "a very loving father" and that the children were "very affectionate" with the father. The grandfather also testified that he and the grandmother would be willing to assist the father with taking care of the children, although they did not want to be a long-term placement option.

Albert Doepner, a licensed professional counselor, provided counseling services to the father during the case. Doepner testified that his treatment goals were to "eliminate physical abuse of the child, develop protective parenting skills, and develop a safe physical environment for the child." According to Doepner, the father completed his protective-parenting classes and attended approximately 15 of 27 counseling sessions, which he characterized as "not totally successful." Additionally, Doepner opined that the father's home was "reasonably safe from a physical point of view." Doepner testified that he had advised the father to stop using marijuana while the case was ongoing, but the father did not stop.

Tim Mitchell, a CPS technician, observed some of the father's initial visits with the children. Mitchell testified that the "[k]ids were always happy to see him when he got there. He was always appropriate and brought everything needed for the kids. Never really had any problems during the visits. Everything was appropriate." He also testified that the father missed some visits, was late to others, and ended one visit early.

Auburn Gallagher, a visitation supervisor for the Department, observed four or five of the father's visits with the children. Gallagher testified that during the first visit she supervised, "[t]he girls were overly excited to see their father, ran to him," and the "visit went well." Gallagher explained that the father interacted with the children "the entire time" and that

11

at the end of the visit, "the girls didn't want to leave." She added that the younger child wanted to get in the father's car and go home with him, which was "heartbreaking" for the father.

Priscilla Day, the Court Appointed Special Advocate for the children, testified that she attended several visits and that they were "typically very good." However, she noticed that during some visits at fast-food restaurants, the children would go to the playscape areas and the father would not engage with them, instead spending his time conversing with the other adults who were with him. Day also explained that during one visit, the father left an hour early, purportedly to take a drug test, but Day learned that the father did not show up for the test. This and other behavior concerned Day, who believed that the father should be spending as much time as possible with the children during his limited visitation time. Day also believed that the father's failure to comply with the terms of his service plan, including his failure to abstain from marijuana, reflected negatively on his desire to be a parent. She explained, "[A] father who genuinely wanted their children would comply with a program for a year or, in this case it went a little bit over a year, but I would have moved mountains and done everything required to do it. . . . And that is not at all what I've seen in [the father] in this case."

**The agency's plans for the children and the stability of the proposed placement**

The Department's plan for the children was adoption by the children's foster parents, both of whom testified at trial. The foster mother testified that she and her husband have two sons, ages 14 and 10, and have lived in their current home for nine years. She was employed as a behavioral instructional assistant at a local elementary school where she received an award twice for "Aide of the Year." The foster mother was trained in "de-escalating" situations at school when children act aggressively.

12

The foster mother testified that she received the children the night that they were removed from the father. According to the foster mother, the children "smelled like smoke" and their feet were "really, really dirty" and "smelled really, really bad." When the children first began living with the foster parents, the older child would get upset if "she wanted something she couldn't have" and would "go into these fits where she would bang her head up against the wall and bite herself." The foster mother testified that in response to this behavior, she would "go over to her and sit next to her and just give her a hug and just squeeze her and then her body would just relax and we would talk." The foster mother added, "I would tell her come tell me what is wrong when you're upset, if you need a hug. You cannot hit your head on the wall. It will hurt you." Eventually, the child's self-harming behavior subsided.

When the children first arrived at the foster home, they would eat food off the ground and dig through the trash can for food. The foster mother responded by making sure that the children always had enough food to eat, both at and away from home. The foster mother believed that this response worked, because "they're not eating out of the trash can or off the floor anymore." In the fifteen months that the children had been in her care, the foster mother observed other positive changes, including improved physical health, greater happiness, and a better ability to use words to communicate their feelings. The foster mother also explained that the children and her sons get along "great" and play well with each other. The foster mother testified that she was committed to the children and willing to adopt them if the father's parental rights were terminated. However, if the father's parental rights were not terminated, she did not believe that it would be in the children's best interest for them to continue living with her on a long-term basis. She added, "I am committed to the girls 100 percent for what's best for them." The foster father provided similar testimony regarding his love for the children, the children's

13

positive interaction with his sons, and the improvements that he had seen in the children since they had begun living with them.

David Westbrook, a case manager at the adoption and foster agency that the foster parents used, described the care that the foster parents provided to the children. He testified:

> The [foster parents] are the type of family that we really look for in—to foster. They have a really great passion for caring for children and also, you know, they understand the difference between the emotion of it and the facts of what's going on and the severity of being separated from the biological parents. So they are able to really look at the needs of the child, make sure they're getting what they need, make sure they're getting their biological connection.

Westbrook explained that the foster parents helped ensure that the children had a connection to their biological parents by supporting visitation while the case was ongoing and by "being the first to feel happy when [the biological parents] were being successful and then supporting the children when they weren't able to go to visits." Westbrook also visited the foster parents' home on multiple occasions. He testified that the children "always seemed very happy in the home" and that "when there were behavioral issues it was very easily redirected just through discussion" and "praise for good behavior." Westbrook added, "I don't have any concerns about them staying in the [foster] home."

**The emotional and physical danger to the children now and in the future**

In the Department's view, the primary danger to the children stemmed from their exposure to domestic violence and physical abuse while in the father's care. The evidence showed that the bruising to the younger child was severe. The day after the children were removed from the father, the foster mother took the children to an emergency room for

evaluation. Dr. Erin Munns, an emergency-room pediatrician at Dell Children's Medical Center, examined the younger child and testified that "there was a large bruise over her right gluteal area and kind of extending over the whole right gluteal area or the butt cheek, kind of up onto the lower back." Based on the size and extent of the bruising, she did not believe that the bruise could have been caused by a simple fall. Instead, she characterized the bruise as "highly concerning for a non-accident trauma injury," which is "something that was purposefully inflicted on a child."

Dr. Munns also examined the older child and observed an abrasion "on her upper shoulder kind of extending on the arm, shoulder area onto the back and there was almost like a little scalloped edge to it." Dr. Munns was concerned that the abrasion could be from a handprint.

Dr. Katherine Snyder, a pediatric child-abuse specialist, reviewed the younger child's medical records and photographs of the bruise, which she described as "very, very large." Dr. Snyder testified that because the child was still in diapers when the bruising occurred, this decreased the likelihood that the bruising was caused by an "accidental mechanism." In addition to the size of the bruise, Dr. Snyder was concerned that the bruise extended from the back to the side of the child. This could mean that there were "two separate impacts," that "the injury was so severe that it bled significantly and the blood tracked," or that "whatever was used to cause the injury actually physically wrapped around the contour of that buttock onto the hip." Dr. Snyder testified that the bruising was "most consistent with a blunt force impact with an object correlating pattern" such as a hand, with "enough blunt force impact to cause breaking of blood vessels." Dr. Snyder concluded that these injuries were "concerning for physical abuse." Dr. Snyder testified that CPS's explanation for the bruising was that the older child had reported that

15

the father's girlfriend had "beat [the younger child's] ass." Although Dr. Snyder did not know if that had occurred, she believed that the child's injuries were consistent with that explanation.

Dr. Snyder also reviewed the abrasion to the older child's shoulder. She observed "some bruising that goes from the back of her upper left arm here and it traverses and goes over onto the edge of the left back." This suggested to Dr. Snyder that "potentially someone was grabbing or scratching at her causing that injury." She testified that the injuries to both children were "concerning" for possible physical abuse, but especially the younger child's injuries.

### The children's desires and physical and emotional needs

Cynde Williams, a licensed professional counselor and the older child's therapist, testified that the older child referred to her foster parents as "mom" and "dad" and her biological parents as "other mom and dad." According to Williams, when she first began treating the child, "she was pretty aggressive at school, throwing things," having "outbursts," hitting others, and having night terrors. The child also engaged in self harm, such as biting her arm. More recently, however, the child's demeanor was "calm and peaceful," and she no longer had night terrors. Williams credited the foster parents with the child's progress and remarked that "they've done a really great job with her."

Lina Espinosa, one of the teachers at the children's daycare prior to removal, similarly testified regarding the older child's aggressive behavior, and she also testified that the child would harm herself by hitting her head against the wall. Espinosa further recounted that when the father dropped off the children at the daycare, "the girls never want[ed] to leave the dad" and were "pretty attached to the dad so it was a hard time always to drop off because they were crying, they wanted to go with the dad."

16

Keela Hattley, the teacher at that daycare who reported the younger child's bruise to CPS, had worked with both children when they attended the daycare. Hattley testified that the children smelled like smoke in the mornings when they arrived, often had dirty hair, feet, and nails, wore clothing that did not fit, and were hungry. Additionally, the younger child cussed "a lot," particularly using the word "shit." Hattley testified that she believed the father loved the children and "tried his hardest to keep them up to par," but she believed he "needed help."

Mark Weber, a licensed professional counselor and the younger child's therapist, testified that the younger child identified her family as her sister, her foster parents, and her foster brothers. She referred to her foster parents as "mom" and "dad." This surprised Weber, who "assume[d] that she would have made some connection to her birth parents but she made no mention" of them.

Rick Treadway-Teran, a licensed marriage and family therapist, performed developmental assessments on both children. Treadway-Teran testified that the older child was attached to the foster parents and "seemed to be extremely comfortable in their presence." He also testified that the older child had a history of self-harm and aggressive behavior and that he observed that behavior decrease over her time with the foster family. Treadway-Teran was concerned that if the child were returned to the father, "there would be some level of regression." He added, "Can't guarantee that, but I believe the disruption of the household she had been in for almost, you know, a third of her life would once again be disrupted at an older age. And then she would move forward with possible regression." Treadway-Teran further testified that the younger child was in the "same situation" as the older child and had likely experienced similar traumatic experiences while in the father's care, including exposure to "inconsistency and aggression."

17

Ginger Schneider, the director of the children's post-removal daycare, testified that the older child "had a difficult time in the classroom. She wasn't happy. She didn't want to follow directions in the classroom with the teacher. She didn't handle transitions well. She just really wanted to do what she wanted to do and not be corrected." Also, "[s]he would get angry. She would throw chairs. She would throw toys. She would hit the teacher." If the teacher tried to redirect the child, "she would scream. She would holler." Schneider testified that the younger child "would act out some too," imitating her sister. According to Schneider, the children's behavior improved over time. Schneider had known the foster parents for many years, because the foster parents' son had also attended the daycare. Schneider testified that "[t]hey were always very loving and caring parents" and were proactive and involved in the girls' development.

**Conclusions regarding sufficiency**

In summary, the Department presented evidence that the father had exposed the children to domestic violence and physical abuse, had a history of using drugs and engaging in criminal behavior, would not stop using marijuana even though it was required to obtain the return of the children, allowed the mother to have unsupervised access to the children while the mother was using drugs, and refused to acknowledge the possibility that his girlfriend had abused his youngest daughter, even though the evidence, including the daughter's outcry, tended to show that the abuse occurred. Moreover, the Department presented evidence that the children were in a loving, stable foster home, that the children were happy in that home, that the children's health and behavior had improved since their removal from the father's care, and that the children considered their foster parents "mom" and "dad." Viewing this evidence in the light most favorable to the jury's finding, we conclude that a reasonable factfinder could form "a firm

18

belief or conviction" that termination of the father's parental rights was in the best interest of the children. Therefore, the evidence is legally sufficient to support the best-interest finding.

We reach the same conclusion when weighing the disputed evidence contrary to the finding against all the evidence favoring the finding. Some evidence weighed against the finding that termination of the father's parental rights was in the best interest of the children. Specifically, multiple witnesses testified that the father loved the children and that the children loved him. The father attended most of his scheduled visits, and the children were excited to see him during those visits. Prior to their removal, the children did not want the father to leave when he dropped them off at daycare. The children were bonded to the father. Moreover, the father's home situation was relatively stable. He had been living in the same duplex for four years and was purchasing a new home with help from the grandparents, both of whom were supportive of the father and demonstrated a willingness to assist the father in caring for the children, at least on a short-term basis. Also, the father completed some of his services, including protective-parenting classes. However, we are unable to conclude that this evidence is "so significant that the factfinder could not have formed a firm belief or conviction" that termination was appropriate in this case. The bruising that the younger child suffered while in the father's care was severe, as recognized by doctors and other witnesses who had seen and examined the injury. Nevertheless, the father was either unable or unwilling to recognize its severity and did not believe that it was the result of anything other than an accident, even though doctors had concluded that the injury was "purposefully inflicted" on the child and likely the result of a "non-accident trauma injury." A rational factfinder could have reasonably concluded that this and other evidence supporting the jury's best-interest finding outweighed the evidence in the record

19

tending to show that termination was not in the best interest of the children. Accordingly, we conclude that the evidence is factually sufficient to support the best-interest finding.

We overrule the father's sole issue on appeal.

## CONCLUSION

We affirm the trial court's termination order.

_____

Gisela D. Triana, Justice

Before Chief Justice Rose, Justices Baker and Triana

Affirmed

Filed:   April 29, 2020